# EDMOND MORGAN v. STATE.

### No. A-1416.   Opinion Filed March 8, 1913.

#### (130 Pac. 522.)

1. **APPEAL—Review of Evidence.** The credibility of witnesses, and the weight and effect to be given to their testimony, is a question solely for the jury's determination; and, to reverse a judgment for the reason that the verdict is contrary to the evidence, the court must find, as a matter of law, that the evidence is insufficient to warrant the conviction.

2. **TRIAL—Remarks of Prosecuting Attorney.** Remarks of the prosecuting attorney in his argument before the jury, objected to as improper, will be considered and construed in reference to the evidence; and, in order to constitute reversible error, the impropriety indulged in must have been such as may have influenced the verdict.

3. **SAME—Argument of Prosecuting Attorney.** The prosecuting attorney has the right, in his argument before the jury, to discuss all the facts bearing upon the issue within the scope of the evidence.

(Syllabus by the Court.)

> *Appeal from District Court, Seminole County;*
> *Tom D. McKeown, Judge.*

Edmond Morgan was convicted of manslaughter in the first degree, and appeals. Affirmed.

*Crump & Skinner,* for plaintiff in error.

*Chas. West,* Atty. Gen., *Smith C. Matson,* Asst. Atty. Gen., and *C. J. Davenport,* for the State.

DOYLE, J.   Plaintiff in error, Edmond Morgan, hereinafter referred to as the defendant, was convicted of first degree manslaughter, in the district court of Seminole county, on an information filed in said court November 29, 1909, charging him with the murder of one Willie Nusky in said county on or about October 24, 1909, and, in accordance with the verdict of the jury, was sentenced to serve a term of four years' imprison-

ment in the penitentiary. The judgment and sentence was entered on April 29, 1911. To reverse the judgment, an appeal was perfected by filing in this court October 2, 1911, a petition in error with case-made.

The petition alleges numerous assignments of error, only two of which are presented in the brief. First. It is contended "that the evidence is insufficient to sustain the verdict." The circumstances under which the homicide was committed are briefly as follows: Defendant and the deceased were full-blood Indians. On the night of the homicide, they attended a negro dance some five or six miles from the home of the deceased. Some time after midnight they left the dance and returned to the home of the deceased about 4 o'clock in the morning. The testimony for the state tends to show that the defendant there stabbed the deceased, and he died almost immediately. The defense was a denial, and that, on the road from the dance, the deceased had a fight with a negro whisky peddler, and that the negro had cut him.

The first witness for the state, Mollie Wilson, testified that she and her sister Roda Wilson were staying at the house of the deceased, and were sleeping in the same room with his wife, but on different beds; that the deceased came home about 4 o'clock in the morning, and shortly afterwards the defendant came in; that they both then went out, and she heard the deceased groan; that his wife then went out and said, "They are striking him;" that she went out, and the deceased was lying on the ground; that they picked him up, the defendant assisting, and carried him into the house, and he was dead in a few minutes.

Roda Wilson testified that when she heard Millie Nusky, the wife of the deceased, say, "They are striking him," she took a light and went out. The deceased was lying on the ground, and the defendant was standing by, and she saw the defendant give a knife to Millie Nusky, and Millie handed the knife to her, and the next day, at the inquest, she gave the knife to the officers; that there was blood on the knife and

blood on the ground where the deceased fell; that the defendant stayed at the house until daylight.

Dr. Yates testified that he was a practicing physician; that he examined the body of the deceased, and found a slight wound, just an abrasion, across the forehead, also a wound on the temporal eminence of the cranium, and a third wound below the collar bone, between the second and third ribs, that seemed to be a stab with a knife blade; that the wound ranged down in the direction of the heart; and that this wound would have caused almost if not instant death.

On behalf of the defendant, Jim Woods testified that he met the deceased and the defendant at Konawa, and went with them three miles south to a negro dance, the night of the killing.

Millie Nusky testified that she was the wife of the deceased; that, on the night of the homicide, her husband, Willie Nusky, did not come home until about 4 o'clock in the morning; that he came into the house and sat down on the bed and said "that they had been having a fight and a negro stabbed me"; that there was blood on his face, and, while he was talking to her, the defendant came in and said, "I am going on home;" and her husband said to him, "You had better stay with me to-night and go home in the morning;" and the defendant said, "All right, I will strip my horse," and went out the door, and her husband followed him out; that her husband and the defendant "had nothing against each other, and he did not kill her husband." Her cross-examination we quote from the record:

"Q. Didn't you state to Rebecca West, who was acting as interpreter before the coroner's jury on the 25th day of October, 1909, at the inquest held over the dead body of Willie Nusky, that you saw Edmond Morgan stab Willie Nusky, and that he then gave you the knife? * * * Q. Or that in substance? * * * A. No, sir; I never said it. Q. Didn't you state to Rebecca West, at the coroner's inquest held before W. A. Duncan on the 25th day of October, 1909, that there was nobody present at the time Willie Nusky was killed but Edmond Morgan? * * * A. No sir."

Further:

"Q. Did you see Willie Nusky fall? A. Yes, sir. Q. What did you say when you saw him fall? A. I stated 'that they were striking him and he was falling.' Q. Who was outside of the house with Willie Nusky other than Edmond Morgan? A. No one else."

The defendant testified on his own behalf that he was about 20 years old; that he was with Willie Nusky the night he was killed and when he died; that he and the deceased and Jim Woods went to the negro dance from Konawa, got there about midnight, stayed about on hour, and he and the deceased then started home; after going a few miles, they were overtaken by a negro whisky peddler named Dindy, and a difficulty took place; that the deceased and Dindy got off their horses and were fighting, and witness took a knife from the negro and put the deceased on a horse and brought him home; that he did not exactly know where Dindy lived, but that he was now dead; that, just before they reached the Nusky home, the deceased's hat fell off, and witness stopped to hunt for the hat, and then followed him into the house; that deceased asked him to stay all night, and he said, "All right," and went out to strip his horse, and the deceased followed him out, and, as he started to unsaddle the horse, he saw him fall; that the women came out with a light, and he helped them take him into the house, and then stayed there until daylight; and that he (the defendant) did not stab and kill the deceased.

In rebuttal, Mrs. Rebecca West testified that she acted as interpreter at the inquest, and that Millie Nusky stated in that examination that Edmond Morgan, the defendant, stabbed her husband, Willie Nusky.

It is the exclusive province of the jury to determine questions of fact. They, and they only, have a right to judge the credibility of the various witnesses; and the weight and effect to be given their testimony was a question solely for the jury's determination; and we think that the defendant received, at the hands of the jury, the benefit of every doubt in the case, and

we only wonder that the jury by their verdict assessed the minimum penalty.

The second assignment relates to alleged misconduct on the part of the prosecuting attorney during the trial, and in his argument to the jury. Exception was taken and objection is made to the rigor of the cross-examination of Millie Nusky and the defendant. These are matters largely within the discretion of the trial judge; and, in view of the testimony of the wife of the deceased and the defendant's testimony, we think the discretion was not abused. Their testimony justified a searching examination into her relations with the defendant.

In the course of the argument, the prosecuting attorney used this language:

"I did say the woman had been fixed, and I say it now. You don't only have my word for it, gentlemen of the jury, but you have the word of Dr. Yates, and you have the word of Mrs. West."

This statement was objected to, and the prosecuting attorney said: "I don't know; probably a better word would be that I believe, from the evidence, that she committed perjury." This it is claimed constitutes misconduct on the part of the prosecuting attorney.

The remarks of counsel must be considered and construed in reference to the evidence, and it is doubtful if they were objectionable. The testimony teems with indications of willful perjury upon the part of the wife of the deceased. She had testified, at the preliminary, that the defendant stabbed the deceased. On the trial as a witness for the defendant, her testimony was just the opposite. A prosecuting attorney, confronted with such a witness, necessarily feels a great surprise, and naturally concludes that perjury has been committed. The second objection is that he used the following language:

"All must be drawn on the conclusion that he was a frequent caller at the home of the deceased, and that the deceased's wife is now trying to shield him by her testifying as it is shown from the witness stand. Where is the motive?"

This was the conclusion of an elaborate argument on the question of motive, and we think the argument was legitimate, under the evidence in the case. However, the trial court sustained the objections.

In order to constitute reversible error, the impropriety indulged in must have been such that may have wrongfully influenced the verdict. The verdict returned shows that no injury was suffered by the defendant.

In *Thacker v. State,* 3 Okla. Cr. 485, 106 Pac. 986, it is held:

"Remarks of the prosecuting attorney in his argument before the jury, objected to as improper, will be considered and construed in reference to the evidence; and, in order to constitute reversible error, the impropriety indulged in must have been such as may have influenced the verdict."

After a careful examination and consideration of the entire record, we are of opinion that the defendant had a fair trial, and we are satisfied that the verdict is sufficiently supported by competent evidence, and that no error was committed prejudicial to his substantial rights.

The judgment of the district court of Seminole county is therefore affirmed.

ARMSTRONG, P. J., and FURMAN, J., concur.