## CURTIS KING v. STATE.

No. A-4185.   Opinion Filed Oct. 17, 1923.
(219 Pac. 164.)

(Syllabus.)

1.   **Appeal and Error—No Right to Complain of Favorable Instruction not Excepted to.** The trial court instructed that rape committed by force and violence overcoming resistance by a male under 18 years of age with a female over 14 years of age was rape in the second degree. No exception was taken to such charge, and it is held that, if any error was committed, it was an error favorable to defendant, of which he will not be allowed to complain in this court.

2.   **Appeal and Error—Conviction not Reversed for Conflicting Evidence.** Where there is competent and apparently credible evidence to support the verdict and judgment, the conviction will not be set aside on appeal because of conflicts in the evidence.

3.   **Appeal and Error—Necessity for Objections Below—Improper Cross-Examination.** Where the subject-matter of interrogatories propounded on cross-examination is proper, and no timely objection urged to the form of the questions, no reviewable error is presented on appeal by an assignment that the trial court erred in permitting improper questions to be asked on cross-examination.

4.   **Appeal and Error—Necessity for Prejudicial Error—Remarks of Prosecuting Counsel.** Remarks of prosecuting counsel, in order to constitute reversible error, must have been such as may have influenced the verdict to the prejudice of defendant.

Appeal from District Court, Payne County; C. C. Smith, Judge.

Curtis King was convicted of rape, and he appeals. Affirmed.

This is an appeal from a judgment of conviction for the crime of rape in the second degree rendered in the district court of Payne county on the 29th day of October, 1921. Petition in error and case-made were filed in this court on the 27th day of January, 1922.

The petition in error sets out a number of errors, but counsel for plaintiff in error have abandoned all except the following:

"(1) Said court erred in overruling the motion of the defendant for a new trial for the reason that the verdict is not sustained by sufficient evidence, is contrary to the law and evidence, and is the result of passion and prejudice, and not founded upon the evidence.

"(2) Error of the court in permitting C. C. Suman, employed to assist in the prosecution of said cause, to make inflammatory and prejudicial argument as set out in defendant's motion for a new trial.

"(3) The court erred in rendering judgment adjudging the defendant guilty of the crime of rape in the second degree and sentencing him to a term in the state reformatory."

The state relied for this conviction upon the testimony of the prosecutrix, Helen Chapman, and her mother, Zella Chapman. Helen Chapman testified substantially as follows:

"My name is Helen Chapman. I am 17 years old. On the 7th day of April, 1921, I was at home until a little after 8 o'clock. I saw the defendant that night out in front of our house. Some time after 8 o'clock a few minutes the telephone rang—we were all sitting in the dining room—and I answered the phone, and in substance they asked me what I was doing; why I hadn't been up town. I told them I didn't have any business up there. They asked me what I was doing. I told them sitting in the dining room. He

asked me who it was, and then says, 'Who does it sound like;' and I says, 'It sounds like Russell Walker.' Russell Walker was boarding with us at that time, and previous to this some of the boys had been calling me up a few times, and pretended like they wanted to make dates, then come home and joke about it. I did not know who talked to me over the phone, but I thought it was Russell Walker at the time. He said, after I talked to him a few minutes, 'It is Russell Walker;' but after I talked to him I said I didn't believe it was. He says: 'All right; I will be there in about 15 minutes and show you it is.' I told him to come ahead. Ten or 15 minutes later Eddie Wilkins and Curtis King came. I had not met Curtis King before that time, but we trade at the meat market where he works, and I had been down there a few times, and had seen him there. I had never been introduced to him, and did not know him except to be in the shop. I had never had any conversation with him, nor had ever gone out with him any place. When they first drove up Eddie Wilkins asked me if they looked like Russell, and I told them 'No.' They were in a Ford car, and were both sitting in the front seat. Eddie Wilkins was driving. I said, 'No.' He says, 'Meet my friend, Mr. King,' and introduced me to him. Then he said, 'Where is Ruth tonight?' And I says, 'Down home, I suppose.' He says, 'Let's go down and get her.' I says, 'I don't know about that.' He says, 'Well, we will go see what she is doing; get in the car.' I said I would have to go back and get my wraps, and went back and got my wraps, and told Mama it was Eddie Wilkins and Curtis King. I didn't know his first name at that time, and just said King.

"After I got my wraps I went back and got in the car in the front seat. Eddie Wilkins was driving at that time. We went first to the Greek's. It was on Main street, but I don't know what number, but it is on the south part of Main street in the business part here in Stillwater—either in the 900 or 1,000 block. I lived at 623 Lewis, Stillwater, Okla., on the corner of Lewis and Seventh street, at that time. On the way down there, I don't know which one started, but one of them said, 'We better stop in and see about if Ruth is home.' I guess that was Eddie. Ruth is Ruth Stover, and I had

been going with her some.  They talked back and forth like they had thought of it at that time, and when they got down to the Greek's Eddie said, 'I will go in and phone, and you folks drive on for about 5 minutes, and come back and get me.'  He got out of the car then, and Curtis King got in the front seat and drove south from there.  I don't know those directions very well.  We went south a block and a half, I believe, the place you turn where you go to the Fair Grounds. You pass by the schoolhouse, Lincoln, I think, on Tenth street—it is down in the south part of town, and across the railroad track by the Fair Grounds—and turned north and went north to the road that runs back into Stillwater.  Then we turned west, went across the twin bridges, and came in home.  Since the preliminary hearing I have been over the road once with Arthur Suthard, and yesterday I went over it with May Webb and Lawrence Webb, and followed it the way Curtis King drove that night.  At the time of preliminary hearing I had not been over the road except the time when he drove me.  Then we came in on the road that comes in between Fifth and Sixth avenues, and turned north on Lowry street, and went to Third street, and then turned over to Husband street, and went about a mile and a half north here.  We went out north, and then turned west on that byroad.  At that time it was not a much traveled road.  I don't know whether it has been traveled more than it was or not since that time.  We crossed a little bridge—went a little beyond.  The bridge is about a fourth of a mile west from the corner.  I didn't notice but one house down in there that night.  In going out there that other time, I saw another house to the northwest over there, and I believe that is the closest one.  It was over northwest from where we were stopped.  We went a little beyond the bridge.

"The roads at that time on that byroad was rather rough, and I told him we had better go back for the road was too rough, and we wouldn't get back in five minutes. He said, 'All right;' and acted like he was going to turn around, and killed his engine.  When his engine went down, he says, 'My old engine has gone dead;' and I says, 'Well, crank it up, and let's get on back.'  Then I repeated it again, and he says, 'There is no hurry about it, is there?'  I told him,

'Yes;' that there was; and when I said that he threw his arms around me. He put his right arm round my neck and his left one here in front of me. When he did that I told him to quit that right now; that I didn't allow such things as that. I made it very emphatic; and he said, 'You don't really mean that, do you?' I told him I did. Then I told him to get out and crank that car and get to town mighty quick. He sat there a while, and says, 'Well, do you really mean it?' I told him I certainly did, and for him to hurry up about it. He says, 'Well,' and climbed over the little door, and got out on the fender, and when he got out there he says, 'Well, raise up a minute, please.' I supposed he wanted something under the car seat or something, so I started to raise up, and he grabbed me. He put his arm around under me—between me—right up over my knees, and his left arm around me, and grabbed my hands. I saw that I would have to put a stop to it right then. I simply jerked my whole weight against him, and couldn't do anything, and I grabbed hold of the wheel with my feet, and tried to pull back, but that made it harder to pull against his force. I wormed around, and tried to pull away from him, and was telling him to quit that, and be in a hurry about it, but he didn't. At that time he put one of his feet in the back seat of the car, and that was a better advantage, and after a while he put his other foot in there and we fought for a long time, and after a while he got me over into the back seat. I was trying with all my power to make him quit. I was telling him to quit, and was throwing my whole force against him, trying to get my hands loose, and had got hold of the steering wheel, and I was screaming, trying to arouse somebody. When we got over in the back seat I kicked him on the ankles, but he had already forced me down in the seat, and I couldn't kick quite so hard. While he was pulling me over the front seat into the back seat I was resisting to my utmost. When we got in the back seat I kicked his ankles; then he used both of his hands to hold my hands, and we twisted, and fought, and he was trying to lay me diagonally across the seat, with my head to the south of the car, and I would try to turn over on my hands; then I could have gotten my hands from him. At first they were in front of me, but as fast as—when

he got me over there, he took one of them in each, and took them around and put them behind me, and then pushed me up in the corner of the seat with my hands behind me. After he did that, he lay with his shoulders here on this one, and got hold to a better advantage, with the outside of his shoulder pressed down here, and I couldn't get my arm out as easy; but I did several times, but he could tell as soon as my hand was loose from his. One time when I got my hand loose I yanked his hair, and he grabbed it, but I didn't get firm enough. Another time I got it out, and he was pulling up my clothes, and I pulled them down, and then he got my hand back behind me again. After he got me in—when we were sitting up, backwards and forth, then, after I was laying back, he threw his weight on me, and would gradually pull up my clothing, and I would try to set up and straighten them. I fought him there for, I wouldn't say exactly, but it was good 2 hours and 45 minutes. I fought him by struggling and by screaming until my strength was completely exhausted. Several times he would lay me down, and I could sit up straight, and I did that several times before I was so weak I could do it no more. The last time I fell back completely exhausted. I couldn't raise my finger, I don't believe, and then is when he had intercourse. My menstrual period was on then, and I had it on at that time. It was torn loose from my teddy bears. I also had on an underskirt. That is my teddy bear. My napkin was fastened through here, and that rent was made when he tore the napkin loose. The blood on the teddy bear got there that night. That is my underskirt that I had on that night, and the blood on there got on when my napkin was torn off. It got there when he had intercourse with me. I never consented at any time for him to have intercourse with me. When he was through with intercourse, he got up, and said, 'Where is my cigarettes?' and felt around for them, I guess. I didn't pay much attention to him. He says, 'Let's go back to town. I have got to get some cigarettes.' At the time he had intercourse with me his body entered mine. When he started to enter I had intense pain, and screamed, and he said, 'I guess I am not getting it in right.' He took his fingers and nearly tore the insides out of me; I thought my whole insides were coming out, anyway. When he was

through he got up and said, 'Where is my cigarettes? I guess I better go back to town and get some.' He said, 'Come on and get up in the front seat.' I laid there; I was so exhausted I couldn't move. So he picked me up and put me in the front seat, and we drove to town. He went on west to the road, and went down through the college grounds and on into town.

"It was about 15 or 20 minutes before 12 when he took me home. I was nowhere else than where I have mentioned. We were out there during all this time. When I went in our house I went in the east door of the front room on the west side—it was the west door of the front room. I don't remember what I did when I went in, but I was told that I slammed the door mighty hard. Then I went into the dining room and turned on the light, and came back into the hall, and got a school tablet and pencil, and went back into the dining room and wrote a note to Mamma, and told her what happened that night. Exhibit C is the note I wrote to Mamma. I took it up stairs, and when I went in through the room Mamma says, 'You have been up pretty late.' I handed the note to her, and told her to read it in the morning. I didn't see Mamma again until in the morning about 6 o'clock. I talked to her about what had happened. Then Mamma and Papa had Curtis King arrested. At the time this occurred I was in my menstruation period, and I was all weakened, but except from cramping I didn't have so very much pain. When I am up on my feet very much I faint, but I had doped up quite a bit that day so I could go to school, and didn't have much pain, only cramps. I weighed 109 pounds at that time; now I weigh 114. I was not strong. I very frequently had to be under the doctor's treatment. I was doctored for spinal trouble and for a general weakened condition, and female trouble. I was not Curtis King's wife at that time. This occurred in Payne county, Okla. At the time I made the resistance I spoke of I was unable to do anything else than I did do."

Mrs. Zella Chapman testified on direct examination substantially as follows:

"I live in Stillwater, and am the mother of the prosecutrix, who was 17 years old on February 22, 1921. On April 7, 1921, Helen had her monthly period, and she is always weak at that time, but can be up by the use of narcotics. She takes dope to keep her misery down. She was not feeling well at that time, but was staying up as much as she could. But she takes those narcotics to keep her going so she can go to school and things like that. I do not know what her weight was at that time, but we weighed her the morning of the preliminary and she weighed 109 pounds. That was about a week later. Helen has always been a frail child. On the evening of April 7, 1921, I was at home. Helen was home until some time between 8 and 9 o'clock. I don't know the exact time. She was sitting in the dining room with us when she had a phone call. I heard Helen say that it was Russell Walker, and then ask if it was Russell Walker. Later she said she didn't believe it was Russell, or something like that. There was nothing in what she said that amounted to very much that I remember of. Only they were evidently talking about who was coming up. I believe I heard her say something about she had no business up town, or something; I don't remember the conversation, exactly. She went out of doors after the phone call, in the street later, and I think she came back into the dining room a while and sat down, and later she went out. I guess I heard a car stop, but I didn't hear any conversation. She got up and went out. I gathered from the answers she made that whoever it was was coming to show her it was Russell Walker, and she went out when the car stopped. She came back in the house, and said that it wasn't Russell; it was Eddie Wilkins. We were talking in the dining room. I thought she went up stairs, but she didn't. She got her coat. I never paid any attention. I don't think I answered her when she said that. There was some one in there talking. She went out. I judge it was a little after 8:30. About a quarter until midnight I saw my daughter again. I didn't see her for 5 or 10 minutes later, but she came home at that time. I was up and had been watching the clock. She was out later than I thought she ought to be out. When she came home she didn't come upstairs for a few minutes, and she came

in the front door and walked in the dining room, and she went back into the front room, and then go back, and then 5 or 10 minutes later she came up stairs. My husband called her, and she answered it was her. I prepared for bed then. She was home. When she came up stairs she didn't turn on the light, but she just fixed herself for bed. Before retiring she gave me this note. She was in an exhausted condition for two or three days. She was nervous, and couldn't eat or sleep, and wasn't able to be up and was too restless to be still. She remained in her room, laying down quite a bit. Sometimes she laid down on a pallet in front of the heater in the front room.''

The defendant in his own behalf testified as follows on direct examination:

''I am 18 years old. I was born April 22, 1903. On April 7, 1921, I was 17 years of age. I was married a little over one month ago. This is my wife and this is my mother. I was born in Sentinel, Okla. I have five brothers. My father has been dead about 7 or 8 years. I have completed two terms in the eighth grade at Sentinel, Okla., and have not gone to school since. I am a meat cutter, and have worked at that trade for about five years. I have been in Stillwater about two years. H. G. King, who is proprietor of King's Meat Market, is my brother. I have been in Stillwater on two occasions. This last time I have been working at King's Meat Market for about 7 months. I worked for Mr. Bodenheimer for about 8 months. I roomed at Otto Gray's at that time. The last time I have stayed with by brother, Hollis, at his home. I am now living at Gray's. I am acquainted with Helen Chapman, the prosecuting witness in this case. I first got acquainted with her on April 7. I had never met her before that time. I am acquainted with Eddie Wilkins. That evening I was coming up the street in a car, and seen him and Homer Hinkle standing on the sidewalk in front of the Youst hotel. I was going north on Main street in a Ford car. The top was up, and it was a five-passenger touring car. I asked them to go riding, and they got in, and we went up by the college and back down to the Greek's. I called up 80, and Helen answered. I talked to her a while,

and she thought it was Russell, and I told her at first it was. I asked her if she wanted to go riding, and she said 'No;' she wasn't feeling good. I told her if she didn't want to go out with me I would be off of her for life, and she made a few excuses, and I told her then my name was 'China' King and she wouldn't believe it. 'China' has been my nickname ever since I can remember. I was called that around home by my brothers. She wouldn't believe it, and I told her it was. I told her I would come down and show her it wasn't Russell Walker, and I would be down in 10 or 15 minutes. We went out to the car, and I didn't know where she lived, and went to the corner past her house, and then came back in front of her house. Eddie was driving. The car was headed south when we stopped, and he honked the horn. She had on a house dress. Eddie asked her if I looked like Russell, and she said 'No,' and then he said, 'Meet China King, or C. M. King.' Then we asked her to go for a ride, and we would see if we couldn't get another girl. She said she would run back and get her coat. She got her coat, and come on out in a run, and got in the car, and said we would have to hurry to get away in a hurry or her folks would see her. We drove down to the Greek's. All three of us rode in the front seat. Eddie got out down there. I knew the girl he was going to call up, and I told him I would drive around about 5 minutes and come back, and if he got the girl to stop me when I came back across Main street, and if he didn't get her I wouldn't stop. Eddie got out and went in the Greek's and I drove off. I was sitting on the other side of Helen, and I got right over in front of her to the wheel. I told her we was going to drive around about 5 minutes, and she said, 'All right.' Then I drove south to Fourteenth street, and then went down to the Perkins road, and about 200 yards down that, and turned around and came back. I told Eddie I would be back in 5 minutes. Eddie was going to call this girl, and if he got the girl to go with us he would stop us, and if he didn't he wouldn't say anything. I came back on Fourteenth street and up Lewis street across Main street on Ninth. Eddie was standing on Creech & Bradley's corner. He didn't say anything to me. I knew—I knew he didn't get no girl to go. I drove on, and told her Eddie

was going to stop me if he got a girl and I knew he hadn't got no girl, and we might as well go riding by ourselves. She says, 'All right.' We went on Ninth street to Duck, and from there north to Elm and east to Husband, and north on Husband street. Husband street goes out on that country road to the edge of town, I suppose. We went about a mile and a half before we turned to the west. At that corner to the north and west there is a big white house. It was right around 9 o'clock, I would judge, when we crossed back to Main street before we started out north. When we turned west we went about 400 or 500 yards. Right from the corner where the big white house is, the land is sloping off all the way down to where we stopped. There is a little stream there, and a small bridge. We went about 100 feet on the other side of the bridge, and I stopped the car there. We talked some; not very much; talked about—she testified about talking about her school, and I didn't say so very much; just a general conversation.

"When I stopped the car I told her I was getting tired driving, and I wanted to get more acquainted with her and I stopped the car, and started a conversation there. During that conversation at first I did not get in the back seat. It seemed to be a lot more comfortable to sit in the back seat, and I asked her to get back there; and she said she couldn't stay long, and I said, 'All right.' She got in the back seat. We talked about school, and who we knew and girls we knew. We sat there in the back seat for quite a while—not very long—and naturally I tried to love her some. I tried to love her a little bit, and she got sore about it and I quit. We talked a while; then I started to love her again; I didn't think she would be so sore about that. And she got very mad about it, and told me to crank up the car and take her to town, which I did. Before I got out to crank up the car I lost my cigarettes there somewhere, and I looked for them, and couldn't find them. I asked her to help me find them, and she found them in the back seat. I got one, and tried to light a cigarette from the fire that comes out of the manifold, and I couldn't do it, and I told her I wanted to come to town, and we got in the front seat and we come to town. She was in the back seat while I cranked the car, and I told her

I was ready to come to town, and asked her to get in the front seat, and she did. We talked about a few things on the way back to town. One of the things I remember I didn't like at the time—she said to me was, she asked me did I own the King's Meat Market, and I told her, 'No;' and she says, 'You own a half interest in it;' and I told her, 'No.' I said a 'working interest.' I took her in front of her home. We had come in on the west road that comes into the college campus. We came in through the college campus, and down Duck street, and came on this next pavement here south of the courthouse. I took her right straight on down to her home—in front of her house. I stopped the car and she got out. I asked her when I could come back, and she said she didn't know whether I could come back again or not. That was all the conversation. I drove on back up to town and got a cold drink and went home. When I got home it was 20 minutes after 11 o'clock. I lived on Lewis street, in the 500 block, with my brother. The next morning I went to work as usual at King's Meat Market. At 8 o'clock I was arrested by the sheriff and Joe Bourdette. They came down there and told us what they wanted, so they arrested me and Tom both. He asked them what they wanted, and they said for identification. We went to the courthouse, to the county attorney's office, I guess. They wanted to know which one was out with the girl, and I didn't know what they meant, and I never said nothing. Then my brother said he didn't know nothing about it, and he was released, and then I told them it was me. I did not have sexual intercourse with this girl on that night in that car. I have never been arrested before in my life, or charged with any public offense of any kind. I have been working ever since I was 12 or 13 years of age.''

Eddie Wilkins testified:

''I am 18 years old. I live at 1102 West Tenth street, at home with my parents. I know Curtis King. I worked for his brother about one year ago, for about 6 or 8 months, in the meat market. I was with Curtis King on the night of April 7 of this year. I met him in front of the Youst Hotel. We rode around for a while. Homer Hinkle was with us.

We went around the college and back and down to the Greek's, a candy kitchen in the 800 or 900 block on Main. Curtis went to the phone, and then he and I went out and got in the car and went up Lewis street to Chapman's. We honked the horn just before we got there, and stopped just north of the place a little ways. We turned the car around and stopped in front of the Chapman place. Helen Chapman came out to the car, and I introduced her to Mr. King. I don't know what was said. She said she was going to have to hurry off before her folks seen her. Before that I believe Curtis asked her to get in the car. I think we said we were going for a ride. We went to the Greek's down Main street. Before that she went in the house for her coat, and came running out to the car and says, 'We will have to hurry off before my folks see me.' She got in the front seat with Curtis and myself. I was driving, and Helen sat next to me, and Curtis was on the outside. If I could think up some girl to take along we was to call her up at the Greek's. We stopped at the Greek's, and I got out on the left side. The car was headed south. Curtis asked her if she knew how to drive a Ford, and she said she didn't, and he got under the wheel and drove it. As well as I remember they were going to be gone 5 or 10 minutes. I went in the Greek's, and they left, and it seems to me that they went south on Main. I went in the Greek's for about a minute, and didn't call up any one. Then I went up and was in front of Creech and Bradley's store on the corner of Ninth and Main, north from the Greek's. I went across the street, and saw some other boys, and talked with them. They were my two brothers. Dee and Ollie, and Homer Hinkle. I stood there about 2 minutes. I saw Curtis King again that night crossing Main street going west on Ninth. Helen Chapman was with him. They were going rather slow. I was acquainted with Helen Chapman before that night, and had been out with her once or twice. We walked around town at night about dusk or dark, and were out an hour. We taken some other girls home, and then back up to her house, and stood outside and talked a little while. I didn't see Curtis again that night.''

On cross-examination he testified:

"Curtis King and I called Miss Chapman by telephone from the Greek's and I went with him to her residence for the purpose of showing him where she lived. Then we left her home and went to the Greek's. I do not think it was agreed that I would call Ruth Stover and the four would go out. It was said, if we could get another girl, we would take her along. It was not my understanding that we would go to Ruth Stover's. It is not a fact that Curtis and I and this other party as we drove around this town planned the rape of this girl. I did not know that Helen Chapman was to be raped that night. I never attempted to call Ruth Stover. I attempted to call Pauline Vermillion. She is not a witness."

Dee Wilkins testified in part that on the evening of April 7th he was at the corner of Ninth and Main streets with Homer Hinkle and his two brothers, Eddie and Ollie Wilkins; that he saw Curtis King going west in a Ford car, and he was crossing Main on Ninth, and a girl was in the car with him. Witness did not know the girl.

Homer Hinkle testified that he was 23 years old, was acquainted with the defendant, and saw defendant and Eddie Wilkins on the night of April 7th. Went down to the Greek's, and defendant did some phoning; called phone No. 80. After talking over phone defendant and Eddie Wilkins got in car and drove off. Witness was standing on the corner of Main and Ninth when he next saw defendant. Defendant was in the car with some lady. Drove west on Ninth street. Did not see defendant any more that evening.

Ed Kelley and Wayne Baker, witnesses, testified that they saw Curtis King and Eddie Wilkins and some girl drive up in front of the Greek's the evening before defendant was arrested; that the three were sitting in the front seat when the car drove up; that Wilkins got out of the car and went into the Greek's, and that defendant and the girl drove off in the car.

Dr. I. A. Briggs testified on direct examination:

"I live in Stillwater; am a physician; have been engaged in active practice of medicine for twenty years. I am a regular practitioner. On the 8th day of April, 1921, this girl's mother brought her to my office in the afternoon. They said they wanted me to examine the girl; that she had been out riding the night before with Mr. King, and that he had taken advantage of her. I just made a digital examination with my finger and hands to ascertain the condition, and found that the regular monthly periods were on her. The mentrual flow or copius was about normal. I didn't notice anything out of the ordinary. It was a little difficult to discover anything because there was two conditions: One condition was I found that there was no hymen. That might necessitate an explanation. By a hymen, I mean this: the vagina, or opening in the private organ, is more or less closed usually with a membrane stretched over it partly, or sometimes entirely over the opening of the vagina. I find there was no membrane there at that time. I could not tell whether there had been a membrane there recently, or if it had been recently ruptured. I hardly think I would have been able to discover anything had it been recently ruptured because of the menstrual flow. I am not sure there had been a hymen there; and, if there had been, I would not have been able to have told whether it had been ruptured or not. Sometimes the opening is entirely closed, and some times it is only partly closed. I could not tell under the conditions whether this girl had undergone sexual intercourse the night before or not. I observed no cuts or abrasions or bruises on the girl. I didn't notice any bruises on her body. I don't recall there was any effort made along that line at all."

On cross-examination he testified:

"I could not tell anything about the condition of her womb because her period was on. She was tender. I could not tell whether there had been intercourse or not. I did not use a speculum. I examined the vagina. The only examination I made was with the fingers. I don't think I looked to see whether there were lacerations. I don't think I saw any marks or bruises. She was nervous. I couldn't say

anything about her strength.  She was somewhat excited, and wanted to get away as quick as she could.  I don't remember anything peculiar about her body.  I was not able to say from my examination whether this girl had recently had sexual intercourse or not."

Hollis G. King testified on direct:

"I am 29 years old; proprietor of King's Market; a brother of the defendant, who is the youngest child.  I am married.  I remember Curtis' arrest.  After I heard of it I got my orders out and went to find out who this girl was. I just knew her name was Helen.  Tom and I went up to see Eddie Wilkins.  We failed to find Eddie, and we then went to her house—to her home—and asked if there was a girl named Helen.  They said there was; that she was sick; and asked me in, and I went in.  The purpose of going there was to find out what the charge was against the boy.  It seemed to be that it was the only place for me to find out.  Mr. Chapman invited me in, and I went in and met Mr. Chapman and his wife.  I asked him the question—told him I wanted to find out about the case—and him and his wife came in, and we sat down, and they proceeded to tell me about the case.  I advised them that under what they told me they would be better off out of court than they was in court.  They said they was damaged, and they would have to have some damages out of the case.  Mr. Chapman said that.  He explained he was going to move to Norman, and he would have to have damages.  I asked him how much money did he want, and he hestitated a while, and said he would have to have $500, anyway, but he didn't know for sure how much he would have to have.  His wife spoke up, and said 'Yes;' they would sure have to have that much.  I told them the boy didn't have $500, and it would be impossible for him to give them $500, but, rather than to have the publicity in my business, and knowing I would have to pay an attorney fee, anyway, if they wanted $200 I would advance the boy $200, and they would drop the case.  They said they couldn't take the $200.  We closed our conversation, and I went back to my market.  That afternoon, right after dinner, he came down to the shop with the

proposition that, if I would sign notes to keep this girl in school five years in Kansas, and pay all her expenses, that he would go up and withdraw the charges. I told him it was out of reason; that I couldn't do it. Then he said if I would pay $500 damages he would withdraw the charges. I told him that $200 would be all that I could pay, or would pay, and he could either take it or I would give it to the attorney, one or the other. He stated he would go back home and talk it over with his people, and come back and let me know. I never seen any more of him until the next morning. Saturday morning, about 6:30, he came down to the shop, and called me up, and stated he had talked it over with his people, and he was willing to accept the $200 and withdraw his charges and keep it out of court. I said we would put a contract up, and we went to Bill's place, and I went in and got a pen, ink, and blank check from Ralph Overman. I wrote out the check to Mr. Chapman, and put it in an envelope, and gave it to Ralph Overman, who runs the place, and told him it was to be delivered to Mr. Chapman when he withdrew his charges before the preliminary trial in the case of Curtis King. If he did this, why the check was his; if he didn't do it, after the preliminary trial the check would be turned back to me. We wrote on the envelope something similar to that statement. Mr. Chapman left, going to the courthouse to see the county attorney to have his charges withdrawn, and to come back to get his $200. I didn't see him any more until about 1 or 2 o'clock, and I seen him in his yard, and I asked him what the county attorney said. He said the county attorney advised him not to withdraw his charges. I said, 'All right. We will go through the courts.' I haven't talked with him since."

On cross-examination he testified:

"I went to Chapman's to find out what the charge was. I knew the county attorney of this county, but I felt I could find out better from the party that was preferring the charges. I did not try to work them. They asked me for money. The county attorney's name was not mentioned. I did not tell them the courts were corrupt. I did tell them I felt they would be better out of court for the publicity of

it. After I suggested that to them they said something about going away. They said they were damaged, and would have to have money. I asked them how much money did they want. They told me they were figuring on moving to Norman. I asked them how much money they wanted. They told me $500. They said they would take it under advisement; they didn't agree to the $200. I told them I would give them $200 rather than to have the publicity of it, and I had to pay an attorney fee any way. I saw Mr. Chapman Saturday in his yard. I was going home, and I stopped to see what he found out from the county attorney. He said the county attorney advised him not to dismiss the case. I never did talk to him again. The check was put up early Saturday morning, and this was about 1 o'clock when I seen him in his yard—after the check had been put up in the morning. When that check was put up I agreed to give him $200 if he would dismiss the case before the preliminary trial. The case was not dismissed. I did not consult a lawyer before putting up the money to see if I were violating the law. I didn't talk to the county attorney because I wanted to talk to the fellow that was interested in the case."

Ralph Overman testified:

"I run a cafe in Stillwater. Hollis King and Mr. Chapman came to my cafe on April 9th. They handed me an envelope and told me to put it in my cash register, and, when they came in and called for it with the papers showing the charge had been dismissed prior to the preliminary, to give Chapman this check. This is the check and this is the envelope. The check is for $200, signed H. G. King. Mr. Chapman did not come back for it. I have had it in my possession ever since."

No cross-examination.

On rebuttal the state called Warren Chapman, father of the prosecutrix, who testified:

"I brought up the papers and they come that day; this man, King, that has the meat market, and his brother, Tom, came there. I answered the door, and they wanted to see

the parents of Helen Chapman. I told them we were there. I called my wife, and she said she would come in a few minutes. She came in pretty soon, and I can't give the exact wording, what was said first, but they said something in regard to this trouble with my daughter. I don't know which one remarked first, but they were very sorry about it, or something like that, and if it could be arranged. I remarked to them that the attorney way—I felt more like taking a gun and going after them than anything else. I says, 'I am a believer in law and order and letting the law be enforced.' My wife didn't agree on that point, but—then he said something. Something was said about he certainly could never live with anything like this over him, and something was brought up about moving away, and we told him we could leave here under these circumstances. No amount of money would settle this case. This older King, he says these courts are very uncertain, and not reliable. They hardly ever a case like this stuck, so many swear falsely. He says, 'You can't depend on the court to do their duty.' He says, 'It would be all right to settle in some way if we could.' And then this Tom replied, says, 'How much would it take to take you to Norman?' or something like that. I says, 'It cost us at least $500 to come here; but,' I says, 'I wouldn't take that amount of money for what he done to my daughter.' Then he kept arguing about his mother being old and it would break her heart to have her know this, and, further, this was the first case of the kind that had occurred, and if we settle this case they would guarantee to have him to leave Stillwater and never come back, and went on that line. I don't remember what other was said, but there was quite a little said at that time. I believe my wife maybe said that we would think it over. We wanted to get rid of them at that time. That afternoon we got to thinking about it, and it seemed as though there had been so many of these cases turned loose, and I made up my mind it would be better to settle it. I went down in the afternoon there to the meat market, and told him, and asked him if we would leave here and settle this case for something like $500 and leave town. And he said, 'No;' his brother was working in the butcher shop, and that he would have to pay it out of his wages, and

he didn't have the money to put up, only $200. I says, 'Well, I will settle this case. I am settling so that we can get away and try to get away from the notoriety about it, and not have this thing brought in the name of my daughter, in settling the case, only to try to get away.' I was making a great mistake. Then I went away and told him I would think it over and come back in the afternoon. I didn't get back that evening. I didn't make up my mind. I wasn't right at myself, to know what I was doing. The next morning we decided I would go there. And along about 8 o'clock I went to the butcher shop and told him I guessed we would settle that way. He told me if I got his name taken off the docket it would be done away with, and that would be all there is to it. He said he would take up and put $200 in the bank or some place else. I said it would make no difference to me; and he went over to Bill's place and put up a check for this amount, and I never had it in my hand; and he wrote on the envelope when it was fixed showing the suit had been withdrawn and he said we was to both come in together and get the money. I went right straight to the courthouse, and I got to thinking what I was doing, the wrong thing, when I struck Mr. Vaughan, and I told him I guess I wanted to withdraw the suit; and he says: 'What is your reason?' The result was that I told him to go ahead and push the suit for all it was worth.''

Dr. I. A. Briggs was recalled, and testified:

''I might add a little in reference to her showing me her wrists. That question was asked this morning, and I wasn't positive about it. I am inclined to believe she did show me her wrists, and there was scratched places or rather bruises on her wrists. They were very slight red places on her wrists. If you looked at them you would see them is about all. I was subpoenaed as a witness for the state originally in this case. My name is indorsed on the information.''

Wilcox & Swank, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen. (J. F. Vaughan, Co. Atty., of Stillwater, of counsel), for the State.

MATSON, P. J. (after stating the facts as above). The information charged rape by force and violence overcoming resistance under the fourth subdivisions of section 1834, Compiled Statutes 1921. Section 1837, Id., provides:

"Rape committed by a male over eighteen years of age upon a female under the age of fourteen years, or incapable through lunacy or unsoundness of mind of giving legal consent; or accomplished with any female by means of force overcoming her resistance, or by means of threats of immediate and great bodily harm, accompanied by apparent power of execution, preventing such resistance, is rape in the first degree. In all other cases rape is of the second degree."

The undisputed evidence was to the effect that the defendant at the time of the alleged conviction of this crime lacked about 2 weeks of being 18 years of age. Under the foregoing statutory provision the trial court held, although the evidence disclosed that, if the crime of rape was committed at all, it was committed by force and violence overcoming resistance, that nevertheless, because the defendant was at that time under the age of 18 years, and the prosecutrix over 14 years of age, the crime was second degree rape, and the court so instructed the jury, and the verdict was for guilt of second degree rape, with punishment fixed as above stated. The question of whether or not this is the first or second degree rape is not raised in this appeal.

The first assignment of error relates to the alleged insufficiency of the evidence. While it is admitted that a conviction for rape in this jurisdiction may be had on the uncorroborated testimony of the prosecutrix, it is in this connection contended that because of the inherently improbable and almost incredible testimony of the prosecutrix there should have been corroboration by other evidence as to the principal facts in order to sustain a conviction. Morris v. State, 9 Okla. Cr. 241, 131 Pac. 731, and other cases.

We deem it unnecessary to enter into a discussion of the revolting details of this alleged crime. An extended synopsis of the testimony of prosecutrix and defendant is given above, and it is sufficient to say that the court does not concur in the view that the circumstances show a lack of corroboration of the testimony of the prosecutrix, but, on the other hand, the court is of the opinion that the circumstances testified to by other witnesses, the conduct of the prosecutrix, and even the testimony of the defendant himself, point unerringly to the truth of the matters testified to by the prosecutrix, and that the evidence as a whole is sufficient to sustain the verdict and judgment. The jury saw the witnesses, were in a position to judge of the truth of the testimony to much better advantage than is this court, and it has never been the policy of this court to reverse a judgment of conviction based upon competent evidence if from such evidence the jury was authorized reasonably to conclude that the accused was guilty of the crime charged.

It is also contended that the trial court erred in permitting counsel for the state to ask certain improper questions on cross-examination of some of the defendant's witnesses, and also of the defendant himself. An examination of the record discloses that as to these particular assignments of error the questions and answers were given either without any objection interposed by counsel representing the defendant, and without any motion whatever to withdraw the same from the consideration of the jury, or else where objection was made the trial court sustained the same. We find, therefore, no action of the trial court adverse to the defendant upon which he can base error in this court. The questions propounded were inquiries into the occupations, social relations, and manners of living of the witnesses, and, while the form of the questions may have been some-

what objectionable, the subject-matter inquired into was proper on cross-examination. Musgraves v. State, 3 Okla. Cr. 421, 106 Pac. 544; Terry et al. v. State, 7 Okla. Cr. 430, 122 Pac. 559; Fowler v. State, 8 Okla. Cr. 130, 126 Pac. 831. Where the subject-matter inquired into was proper, and no timely objections interposed to the form of the questions propounded, the error assigned is purely technical, and presents no substantial ground for reversal.

Counsel for defendant requested that the opening argument of the special prosecutor for the state be taken in shorthand. This was complied with, and it is contended that certain remarks made by counsel for the state in the opening argument were highly inflammatory, improper, and clearly prejudicial to the defendant. We have examined that portion of counsel's opening argument incorporated in the record, and find that on four different occasions counsel for the defendant interposed objections, only one of which was overruled, and on the other three occasions counsel for the state was admonished by the court to keep within the record, and only on one occasion did counsel for the defendant save any exception to the ruling of the court. It is complained that counsel called defendant a "creature," and appealed to the jury as "100 per cent. Americans to stand on the side of this little girl and against the libertines." In referring to the defendant as a "creature" counsel enlarged upon the evidence, and it is apparent that such reference was a deduction which counsel considered the evidence justified. If the story told by the prosecuting witness was true, and the jury believed it, no language could adequately describe one who was guilty of such a heinous offense. The appeal to the jury as "100 per cent. Americans" is condemned. Especially if it were made at a time when the conditions throughout the state were such as they are today, no one

could successfully contend but that it was an appeal to prejudice; but such appeal evidently fell on deaf ears in this case. If it was the purpose of the prosecuting attorney by such appeal to prejudice the jury against defendant, it is apparent from this record that it entirely failed to accomplish such purpose. Evidently the jury resented such reference, or else the jury would not have fixed the punishment at the minimum provided by statute for such offense.

In the body of the opinion in Edwards v. State, 9 Okla. Cr. 306, 131 Pac. 956, 44 L. R. A. (N. S.) 701, this court said:

"Counsel for appellant complained of remarks made by the county attorney in his closing argument to the jury. It is not necessary, however, for us to discuss in detail the nature and character of the remarks made, because upon a consideration of the entire record it affirmatively appears that appellant was not injured thereby. If the minds of the jurors had been misled or inflamed against appellant by anything said by the county attorney, they never would have found appellant guilty of manslaughter in the first degree, when the evidence makes out a plain case of a brutal and cowardly murder."

Also it has been repeatedly held by this court that remarks of the prosecuting attorney in his argument must be considered and construed in reference to the evidence, and in order to constitute reversible error the impropriety indulged in must have been such as may have influenced the verdict. Morgan v. State, 9 Okla. Cr. 22, 130 Pac. 522; Thacker v. State, 3 Okla. Cr. 485, 106 Pac. 986; Williams v. State, 4 Okla. Cr. 523, 114 Pac. 1114. Whatever may be said of the inflammatory nature of the opening argument of the special prosecutor in this case, it is apparent from the verdict returned that it had no prejudicial effect upon the jury, and constitutes no good ground for reversing this judgment.

The testimony as we view it strongly tends to show the defendant's guilt, and we find little in the case to make us look with favor upon the objections urged by the defendant. The trial was eminently a fair one. The jury were fully and properly instructed as to the law, and they found the defendant guilty of the offense charged, assessing only the minimum punishment. We find no good reason for disturbing this verdict.

The judgment is affirmed.

BESSEY and DOYLE, JJ., concur.