## WILLIE SEWELL v. STATE.

No. A-5875.   Opinion Filed Aug. 24, 1927.
Rehearing Denied Oct. 22, 1927.
(260 Pac. 84.)

J. L. Skinner and Anglin & Stevenson, for plaintiff in error.

Geo. F. Short, Atty. Gen., and Leverett Edwards, Asst. Atty. Gen., for the State.

DOYLE, P. J.   This appeal is prosecuted from a conviction had in the district court of Seminole county, in which appellant, Willie Sewell, was found guilty of manslaughter in the first degree and his punishment assessed at confinement in the penitentiary for a term of 15 years.

It appears that appellant and the deceased were

Indians; that all the parties concerned lived 7 or 8 miles south of Holdenville, and that they all attended a stomp dance on the night of August 24, 1923; that Eliza, wife of appellant, and the deceased, following the stomp dance went to the home of Taylor Wolfe, where Eliza was staying, and after breakfast they went up the hillside, into the woods and went to sleep. Appellant, following the stomp dance, went to the home of Sallie Deer, where he was staying. About noon he went to Taylor Wolfe's place, and from there he followed his wife and the deceased upon the hillside and with a club killed Solomon Leetka.

Bud Gordon, deputy sheriff, testified that he found the body of Solomon Leetka lying face down on a pallet, with the back of his head crushed in; that a club about 3 feet long and as big as his arm, with blood on it, was lying near the pallet; that later he arrested Willie Sewell; that Sewell told him that he had hit Solomon Leetka with a club but did not know that he was dead; that there was no evidence of a scuffle around the pallet; that Tom Atkins was with him, and the body was found some 300 yards north of Taylor Wolfe's house in some black jack timber.

For the defense, Eliza Sewell testified that she was the wife of Willie Sewell, and lived with him until the trouble came up about Solomon Leetka in 1922; that she was with Solomon Leetka the day he was killed; that they left Taylor Wolfe's house and went up in the timber, taking a quilt with them, this being about 9 o'clock in the morning; that about noon Willie Sewell came to where they were lying on the pallet and said "What are you doing here?" and Solomon jumped up and picked up a rock; then Willie got a club, and hit Solomon with it; that she did not know how many times Solomon was hit, and then she and Willie Sewell went back down to Taylor Wolfe's. Later she went with

Taylor Wolfe to where Solomon was, and he was still alive; that they picked him up and moved him out of the sun into the shade; that this was about 1 o'clock in the afternoon. That evening Bud Gordon and Tom Atkins came there and looked at the body of Solomon. On cross-examination she testified that she was at the stomp dance the night before, and was up all night, and got to Taylor Wolfe's about sunrise.

Willie Powell testified that he lived about a half mile from appellant's house, and one morning about daybreak Solomon Leetka ran out of appellant's house; that the next day he met Solomon Leetka in the road, and Solomon said: "I have a 38, and I intended to shoot him; you may tell him about it He ran me off this morning. You go ahead and tell him I am intending to shoot him." The following Saturday, at the stomp dance, he told appellant of this conversation. On cross-examination he admitted that he had served a term in the penitentiary.

Taylor Wolfe testified that, after being told by Eliza Sewell that Solomon Leetka was hurt up in the woods, he went up to where Solomon was, and he was still alive; that his pants were down and unbuttoned, and he pulled them up and buttoned them; that he and Eliza Sewell moved Solomon out of the sun into the shade; that the back of his head was crushed in; that he lived about an hour after he got there.

As a witness in his own behalf appellant testified that he lived about 7½ miles south of Holdenville, at Sallie Deer's; that Solomon Leetka at that time was living about one-half mile from the place where he was killed; that the day after the stomp dance he followed his wife up into the woods from Taylor Wolfe's place, and there found Solomon Leetka and his wife in a very compromising position; that he said, "What are you do-

ing?" and Solomon jumped up, and he pulled his pants up with his left hand, and picked up a rock in his right, and said, "You son of a bitch, you get away from here;" that he then got a club and struck Solomon twice; that after he hit him the second time he dropped the rock, and that lick broke the stick; that he did not hit him any more; that he took his wife and went home..

Sallie Leetka, widow of the deceased, testified for the defendant that her husband, Solomon, said to her, "I have had sexual intercourse with Willie Sewell's wife, and if he finds it out he will kill me."

On rebuttal, Tom Atkins testified that he went to the place where the body was, the afternoon of the killing, with Bud Gordon, deputy sheriff; that Eliza Sewell and Joana Davis were there; that Eliza Sewell at that time stated, through Joana Davis, interpreter, that Solomon was lying on the pallet asleep, and that Willie Sewell hit him over the head and killed him; that Solomon never knew what hit him; that part of the stick struck her in the face as it broke, and woke her up; that she showed him the place on her face; and that they found a stick 2 or 3 feet long with blood on it.

Taylor Wolfe, in rebuttal, testified that he lived one-half mile from Eliza Sewell; that he went to the stomp dance about 4 or 5 o'clock; that later Solomon Leetka and Eliza came there; that when he got back home Eliza, Solomon, and Parnosky Tiger were sitting on his porch; that about 1 o'clock Eliza woke him up and told him that Willie had come up to where she and Solomon were lying on the pallet; and that Willie hit Solomon over the head while he was asleep, and hurt him.

Bud Gordon recalled, testified that, when he arrived at the place where Solomon's body was, Eliza was there and that Joana Davis, Tom Atkins, and Taylor Wolfe were there; that Eliza Sewell told him that she and Sol-

omon were lying on the pallet, and that Willie slipped up behind them and struck Solomon on the head; that Solomon never knew what hurt him; that part of the stick broke off, and hit her on the face; that he did not find any rock that could be used.

On the trial numerous objections were made to rulings of the court in the admission and rejection of evidence. It is contended that the conduct of the county attorney towards the defendant in his cross-examination was prejudicial, in asking the defendant whether or not his first wife had been murdered in his home. The court sustained the defendant's objection. The defendant had testified as to his marriages, and had admitted that he left his second wife, Eliza, and had gone to live with Sallie Deer, without having gone through the formality of obtaining any legal separation from his wife, Eliza. However, the court promptly and properly sustained the objection made.

It is next urged that the court erred in sustaining the objections of the county attorney to questions of counsel for the defendant relative to conversations had between the defendant and witnesses concerning the misconduct of his wife with the deceased. As there is nothing in the record to show what the answers of the witnesses would have been, and what testimony they would have given, we are unable to say whether or not the sustaining of the objections constituted error.

As a general rule, in order to reserve an available objection to the exclusion of evidence, a proper question must be asked, and, on objection thereto, an offer must be made at the time, showing what testimony will be given, if the witness is permitted to answer, the purpose and object of the testimony sought to be introduced, and all facts necessary to establish its admissibility. 3 C. J. p. 825; 2 Elliot on Ev. p. 164. Counsel having failed

to make offers of proof, it will be assumed that the rulings of the trial court were correct.

The remaining assignment relates to the alleged misconduct and prejudicial remarks made by the county attorney in his closing argument to the jury. The showing in the record is as follows:

"Let the record show that during the closing argument the county attorney made use of the following statements with reference to other witnesses, not naming them or calling their names; but in the argument the county attorney said: 'We could not put the witnesses upon the stand because "they" fixed them.' The attorney for the defendant interposed an objection, which was sustained, and the remark stricken, and the jury were instructed not to consider it.

"And that the expression by the county attorney, which was objected to, when he said, 'For two years we have been trying to get a trial in this case, but they have passed it over, so they could fix this woman.' The objection was made at this time, and properly sustained and the jury instructed not to consider the remarks. That is what occurred in the courtroom, as the court remembers it now.

"By Mr. Anglin: All right, your honor; can we enter into an agreement that that is the remarks?

"By Mr. Pryor: Yes, sir; I think that is the substance. I don't know whether word for word, but it may be.

"By the Court: I wrote it down at the time; had it here.

"By Mr. Pryor: Yes, sir, in substance, that is it.

"By Mr. Pryor: Mr. Billingsley undertook to explain and show that in making the statement he was answering the argument made by the counsel for the defendant about certain witnesses that were not put on the stand. Mr. Billingsley was answering the argument of the defendant.

"By the Court: The attorneys on both sides in their

enthusiasm perhaps expiated a little too much and went out of the record.

"By Mr. Anglin: I want to say this, your honor: I did not call attention in my argument to any witness which did not testify for the state, and that Mr. Skinner didn't while I was in the courtroom. I wasn't here at all times.

"By the Court: Well, I think that record is plain enough. The jury followed the instructions of the court in that respect, I think. I don't think they considered it."

It is the well-settled doctrine in this state that, in order to constitute reversible error, the impropriety indulged in must have been such that may have wrongfully influenced the verdict. Morgan v. State, 9 Okla. Cr. 22, 130 P. 522; Williams v. State, 4 Okla. Cr. 523, 114 P. 1114; Allen v. State, 13 Okla. Cr. 395, 164 P. 1002.

It is also well settled that the remarks of counsel must be considered and construed in reference to the evidence, and as a matter of good practice where improper remarks are made by the prosecuting attorney in his argument before the jury, when an objection thereto is interposed and a ruling of the court invoked, the court should be requested to charge the jury to disregard such improper argument 'or statement. Gunnells v. State, 7 Okla. Cr. 98, 122 P. 264; Davis v. State, 7 Okla. Cr. 322, 123 P. 560.

The record here shows that the remarks of counsel were properly withdrawn by the court, and that the jury were told not to consider the same, but to base their verdict solely upon the evidence. In Carroll v. United States (C. C. A.) 154 F. 425, the court held:

"It is a general rule, with rare exceptions arising from extreme cases, that prejudice created by unwarranted statements of counsel in the presence of the jury is sufficiently cured by an admonition by the court to the jury to wholly disregard such statements"—citing

numerous authorities, federal and state, in support of the rule.

Upon a careful examination of the record, we cannot see how any jury under the evidence could have returned a verdict other than guilty, at least of manslaughter in the first degree. We think the defendant's own evidence in its most favorable light shows him to be guilty at least of manslaughter in the first degree.

The case having been submitted to the jury upon correct instruction, and no prejudicial error having been committed in the course of the trial, nothing remains for this court to do but to affirm the judgment; and that is accordingly done.

EDWARDS and DAVENPORT, JJ., concur.