## D. A. COLLIER v. STATE.

No. A-3106.   Opinion Filed Feb. 3, 1920.

(186 Pac. 963.)

(Syllabus.)

1.  **HOMICIDE—Alcoholic Insanity or Incapacity Caused by Temporary Voluntary Intoxication as a Defense.** In a prosecution for murder, alcoholic insanity, or mental incapacity produced by voluntary intoxication existing only temporarily at the time of the homicide, is no justification or excuse therefor. To constitute insanity, caused by intoxication, a defense in a trial for murder, it must be insanity caused by chronic alcoholism, and not a mere temporary mental condition.

2.  **CRIMINAL LAW—Defenses—Insanity From Chronic Alcoholism —Temporary Intoxication.** Insanity, though superinduced by excessive and long-continued indulgence in alcoholic liquors and known as "delirium tremens," or "mania a potu," renders a person so afflicted irresponsible for his acts, if it be of such a character as to deprive him of the mental capacity to distinguish between right and wrong, as applied to the particular act, whether

he be under the influence of liquor at the time of the commission of the act or not; but, to do so, his affliction must be settled or fixed insanity, not a mere fit of drunkenness. A person, not previously laboring under such disease or affliction, who voluntarily becomes intoxicated to such an extent and for such a period of time as to cause unconsciousness of his acts, is not irresponsible under the law for the acts done by him while in such mental condition.

3.    **HOMICIDE—Degrees—Evidence of Intoxication—Question for Jury.** Under Okla. Penal Code (section 2313, Rev. Laws 1910), homicide is murder "when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being," and evidence of intoxication is admissible to show an absence of the premeditated design to kill, for the purpose of determining whether the offense was murder or manslaughter, and a state of intoxication which will reduce homicide from murder to manslaughter in the first degree must be of such character and extent as to render the defendant incapable of entertaining or forming a design to effect death. And this question is for the jury to determine.

4.    **SAME—Question of Premeditation or Malice.** Intoxication, either voluntary or involuntary, is to be considered by the jury in a prosecution for murder, in which a premeditated design to effect death is essential, with reference to its effect upon the ability of the defendant at the time to form and entertain such a design, not because, per se, it either excuses or mitigates the crime, but because, in connection with other facts, an absence of malice or premeditation may appear.

5.    **SAME—Conviction for Murder—Sufficiency of Evidence.** In a prosecution for murder, evidence reviewed, showing a predetermined purpose to commit murder, and defendant held justly convicted.

*Appeal from District Court, Pontotoc County;*

*F. B. Swank, Assigned Judge.*

D. A. Collier was convicted of murder, and he appeals. Affirmed.

The information charged that in Pontotoc county, on the 21st day of May, 1916, D. A. Collier did then and there kill one C. H. McFerron, by shooting him with a pistol.

It appears that C. H. McFerron, the deceased, was a pharmacist, employed in Busby's Drug Store in the town of Allen. On the date named, Sunday afternoon, about 2 o'clock, the defendant, Collier, shot and killed C. H. McFerron in said drug store.

Dr. Dullock testified that he heard the shots fired by the defendant and went immediately to the scene of the shooting. The deceased was lying on the floor between the prescription case and the end of the counter. He asked McFerron who shot him. He said, "Collier, and he did not know why Collier had shot him." He found two wounds in his left side, one just below and at the left of the navel, and the other just above it. That McFerron died about 30 minutes after he reached him.

Bently Olivo testified that he and four or five other persons were in Busby's Drug Store; that McFerron was wrapping up a package, and defendant, Collier, was standing across the counter from him when he fired the first shot; that, as witness ran out, he heard two more shots.

Jake Story testified that he was in Busby's Drug Store about 1 o'clock in the afternoon, and defendant was present; that McFerron came to wait on witness, and defendant followed him, wanting to fight McFerron; that defendant said something about a gun; McFerron told him, "I have not got a gun, and there is not a gun in the house"; that this was about an hour before the killing.

Herbert Pegg testified that he was in Busby's Drug Store between 12 and 2 o'clock; that defendant was talking to McFerron, quarreling with him, and wanted McFerron to come out and fight him; defendant said something about a gun, and McFerron denied having one; defendant

left the drug store with Mr. Donaghey; that he thought the defendant was drinking.

Mr. Donaghey testified that about 45 minutes before the shooting he had gone with defendant to Busby's Drug Store; McFerron was reading out of a Bible something about St. Peter; defendant said, "St. Peter, hell, I want a drink of coca cola"; that further on defendant asked McFerron if he wanted to fight; McFerron asked defendant not to start anything; about that time defendant asked McFerron if he had a gun; McFerron replied that he had not; that witness got defendant out on the sidewalk and they started home; that defendant had a bottle of whisky or white mule in his pocket, and was a little intoxicated.

T. A. Olivo testified that he saw defendant go in the drug store and a few seconds after three shots were fired; after the shooting defendant came out and said:

"I killed the God damn son of a bitch. Ain't no damn man can run over me."

Cecil Thompson testified that he was in Busby's Drug Store when the shooting took place; McFerron was behind the show case; Collier walked in, and when he got to where McFerron was he pulled his gun and said, "I will learn some God damn son of a bitch how to run over me."

Clarence Pegg testified that he was in the store at the time of the shooting; that defendant came in, drew a gun from his right side, and shot McFerron; thought the first shot missed; that the second shot took effect, and after the third shot McFerron fell; defendant walked out of the store, whirling his pistol around, and said:

"She is a God damn good one. I have had her 16 years and she never snapped."

S. C. Donaghey testified that, as the defendant came out of the store with the pistol in his hand; he heard him say, "That he had done what he intended to do when he came there."

For the defense, W. A. Leonard testified: That his place of business was next door to Busby's Drug Store. That he had known defendant three or four years prior to the shooting. That on the day McFerron was killed defendant came in through the rear door of his store and sat down in a chair; was there about 10 minutes, apparently asleep. That he heard a noise like the squeaking of a chair or cocking of a gun, didn't know which. Defendant got up and adjusted his gun and said, "Mr. Leonard, you are a friend of mine, aren't you?" I told him, "Yes." That defendant walked to the front door and said, "I am going to kill the son of a bitch." That this was less than five minutes before the killing.

J. O. Day testified that he saw defendant about 10 o'clock in the morning; that defendant was drunk at that time; defendant tried to talk to witness but seemed to have no control of himself; that defendant's reputation in the community as a law-abiding and peaceable citizen when sober was good.

Mack Lee testified that he had seen defendant in a state of intoxication on three or four occasions; that defendant seemed to be pretty reckless sometimes when drunk; that he saw the defendant on Saturday afternoon and he was drunk at that time; saw him Sunday morning and he was very drunk; that he saw the defendant before the killing; that he did not look like a drunk man out of his eyes, but his eyes had a wild look, and the pupils of his eyes were large.

Joe Dean testified that he saw defendant go in the Busby Drug Store between 9 and 10 o'clock; that defendant had alcohol in a grape juice bottle; that he offered a drink to witness; that he did not figure the contents of the bottle was either whisky or alcohol, but that it was some kind of poison; about 12 o'clock witness went in company with Ed Jones and M. Donaghey and tried to get defendant home; that he had seen defendant a number of times when he was drunk, and on this day he was crazy, or something like it, and looked wild out his eyes.

J. F. Rogers testified he saw defendant about 12 o'clock Saturday night and defendant was drunk then; 10 o'clock the next morning he saw defendant at Busby's Drug Store and defendant was drunk; saw him again at 11:30 and defendant was very drunk; that he had seemed to drink so much that he did not realize what he was doing; that he went with defendant back of the blacksmith shop and drank some alcohol; then they both went into the drug store and had a talk with McFerron; defendant wanted to get some coca cola and fix a drink in the drug store; McFerron objected, but gave defendant some syrup and water and told him to fix it; defendant mixed up the stuff, and they both drank it in there; that after this he drank with defendant at Jones' Barn from a quart of whisky half full; that he did not think that defendant knew what he was doing.

Bud Tyson testified that he was a son-in-law of the defendant, and on Saturday night prior to the killing, defendant was drunk.

Dr. S. P. Ross testified that he was a practicing physician in active practice 19 years, but had no special train-

ing in mental diseases; that a man who is insane would not know right from wrong, whether suffering from alcoholic insanity or anyother form of insanity.

Mrs. Collier, wife of the defendant, testified they were married 21 years; that during these years her husband drank a great deal; that on Saturday night he came home intoxicated; the next morning between 8 and 9 o'clock he went downtown; about 12 o'clock he came back and was drunk; walked the floor and talked all kinds of crazy talk and in about 20 minutes went back to town; returned in about an hour and said he had killed McFerron.

As a witness in his own behalf, defendant testified:

I am 40 years old, I have lived with my family at Allen for the past 5 years. Was in the well-drilling business at Allen. Have known Mr. McFerron about 2 years. Our relations were friendly. Have used alcohol and whisky in excess since living at Allen. On Saturday before the killing I worked around the house and some in the garden. Went up in town in the afternoon to Busby's Drug Store and had Mr. McFerron fix me up a drink of coca cola and alcohol at the soda fountain. Asked him to take a drink, and he took a root beer. I paid him 15 cents for the drink and a nickel for the root beer. I bought two or three dollar bottles that evening from him. I got some whisky from other parties. I cannot recollect who right now; everybody in Allen sold whisky. I went home about 1 or 2 o'clock. I was pretty full. After breakfast I walked up town to get a drink at Busby's Drug Store. McFerron was there, and I bought a bottle of mule. I mixed it with syrup and water that McFerron gave me in another botttle. Drank the alcohol with Mr. Rogers and found a grape juice bottle and went back to Mr. Ferron and had him to fill it. He charged me $2 for it, and I paid him. McFerron said, "Pour the small bottle out full and come back and get the rest of this directly," which I did. I went out and drank

this. Some one drank with me, I would not be positive who it was. Then I went back after my larger bottle. It was somewhere near 10 or 10:30. When I went in, I motioned McFerron back behind the prescription counter, as I usually did. I wanted to get my bottle, and he said: "Collier, what in the hell are you trying to do with me this morning? Are you trying to get my job or have me thrown in jail?" I said: "Mac, I am surprised at you. I would not do anything like that." And he said, "Let that bottle sit where it is." I said: "I won't leave it there. I have paid you for it." He said: "You are fixing to get drunk. I have sold you all I could this morning." And he hit at me and knocked me on my face and knocked my hat down, and he said, "Get out of here, you son of a bitch," and he reached for the drawer and said, "God damn you, I will kill you if you don't," and I said, "Don't shoot me, I haven't done anything to be shot for." I put the bottle in my pocket, and he said, "Get out," I said, "I am going," and I proceeded to go. I went down to the livery stable and took a drink out of this bottle, and some one else took a drink out of it. I cannot recollect, it seems like I offered Joe Dean a drink or gave him one. In fixing the bottle, McFerron said: "I am out of syrup. I can put coca cola in it and it will make it red." I said, "That will make no difference." I took one drink. I don't remember drinking any more. The first thing I remember meeting Mr. M. Donaghey and another gentleman.

His further examination was as follows:

"Q. You heard the young man testify here this morning about you coming in while the deceased was reading a Bible? A. Yes, sir; I heard him.

"Q. You recall that? A. No, sir; I cannot.

"Q. Well, you finally went back to Busby's Drug Store, did you? A. Well, I don't remember, seems like that is where I met Mr. Donaghey.

"Q. You know how you came down to the drug store when you killed him? A. I cannot say how I came to go in

there no more than I just walked in as being a hold out place where I had often been in. I cannot recall coming in there. I can recall shooting at him.

"Q. You remember about the shooting, do you? A. Yes, sir, well, it is sort like a dream to me, but I remember shooting. I thought the first thing struck me that Mac had started down behind the show case for his gun when he looked at me the best I can recall, flushed me in the face, and I thought he was aiming to shoot me.

"Q. Was he doing anything? A. He was fooling with some packages as I walked up, he was standing there, and about the first thing I recollect Mac lunged this way, looked at me wild, and I commenced shooting at him.

"Q. Why did you shoot? A. I thought he would shoot me. I thought he was fixing to the best I can recall of the circumstances.

"Q. Do you know how many times you shot? A. No, sir; I do not. I could not say.

"Q. That is your pistol there, is it? A. Yes, sir; I am positive it is my gun.

"Q. Well, you know when you got your gun? A. I do not know how come me with it.

"Q. You remember where you went after the shooting?"

Dr. J. A. Dean testified that the condition which produces alcoholic insanity is temporary; that it is due temporarily to a congestion of the brain; that when any man gets drunk and does incoherent things, things he naturally would not do, he is temporarily insane; that a man that temporarily gets drunk is temporarily insane. He was then asked:

"Q. Doctor, I will ask you if it is possible, where a man starts in drinking one day and continues in the after-

noon and night, and up until the next day, drinking whisky and alcohol, and if he had been addicted to the drink habit many years and was a man 40 years old, if it would be possible under these conditions for insanity to result from it so there would be a total dethronement of his reason? A. Yes, sir; I think so."

In rebuttal, the state called Dr. A. D. Young, professor of mental and nervous diseases on the faculty of the medical department of the University of Oklahoma, who qualified as an expert alienist, who testified that—

"Acute alcoholism is what is ordinarily known as a drunk. It first stimulates and then stupefies the nerves. An insane man is one who does not realize his environment and is out of harmony with his environment. The definition of insanity is rather a hard thing to give to cover all cases, for the simple reason we have to contend with delirium and coma and unconsciousness and sleep and walking in sleep."

His answer to a proper hypothetical question was:

"A. I would say he was sane."

His cross-examination was, in part, as follows:

"Q. If you should take a case where a man 40 years of age, who had drank more or less all of his life, had been on periodical sprees for the last 25 years, and then for the past 3 or 4 years if he had increased his drinking to a great extent and become almost or rather a confirmed drunkard, got on a spree every two or three weeks—would it or not be possible for him to become instantly insane from one of those sprees? A. No. sir."

Dr. A. K. West, head of the medical department of the State University of Oklahoma, in answer to a proper hypothetical question said:

"A. I would say he was sane. That under the conditions stated the defendant was evidently drunk."

Mose Strickland testified that between 11 and 12 o'clock before the shooting he met defendant at Jones' Livery Barn, and they walked down the street together and up the stairway of the courtroom; that defendant had a quart bottle of whisky about two-thirds full, and they both took a drink.

The record covers 400 pages, but the foregoing is in substance the material testimony upon which the verdict is based.

*Guy L. Andrews, Frank G. Andrews, H. M. Carr,* and *King & Crawford,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *E. L. Fulton,* Asst. Atty. Gen. for the State.

DOYLE, P. J. (after stating the facts as above). Plaintiff in error, D. A. Collier, was informed against for the murder of C. H. McFerron, and upon his trial was found guilty of murder and his punishment fixed at imprisonment for life at hard labor.

From the judgment of conviction, an appeal has been duly prosecuted to this court.

The errors assigned are based upon exceptions taken to the rulings of the court upon evidence offered and rejected, and upon instructions given to the jury as to the law of the case, all of which, after verdict, were set out as grounds of a motion for new trial.

Unlike as is usual in such cases, there is not much conflict of testimony. The evidence is undisputed that the

defendant entered the drug store where the deceased was employed as a pharmacist, and without warning shot and killed him.

When the homicide is admitted, justification in self-defense, or excusable by reason of insanity, are almost invariably relied upon as defenses. Both of these defenses, as we gather from the briefs, were interposed in this case. The instructions of the court submitted the issue of murder and of manslaughter in the first degree and fully covered the law of self-defense and the defense of insanity. After a careful consideration of the whole case, we do not think the evidence required instructions upon the law of self-defense, and with greater reason we think that there is not even a pretense of insanity legitimately raised by the facts in evidence. On the contrary, they clearly negative such defense.

It is evident, if the defendant's mind was affected, it was the result of his voluntary intoxication.

The principle is everywhere recognized that voluntary intoxication is no justification or excuse for crime, and is no excuse for homicide, though carried to the extent of producing incapacity to control the mind and will.

Our Penal Code provides:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition." Section 2095, Rev. Laws 1910.

Under our Penal Code (first subdivision, section 2313, Rev. Laws 1910), "homicide is murder * * * when perpetrated without authority of law and with a premeditated

design to effect the death of the person killed, or of any other human being," and evidence of intoxication is admissible, not because per se it either excuses or mitigates the crime, but because, in connection with other facts, an absence of malice or premeditation may appear, and intoxication is to be considered by the jury in a prosecution for murder in which the premeditated design to effect death is essential with reference to its effect upon the ability of the defendant at the time to form and entertain such a design.

In *Cheadle v. State,* 11 Okla. Cr. 566, 149 Pac. 919, L. R. A. 1915E, 1031, it is said:

"Alcoholic insanity, or mental incapacity produced by voluntary intoxication, existing only temporarily at the time of the commission of the homicide, is no excuse or defense in a prosecution therefor. Drunkenness is one thing, and the disease of the mind to which drunkenness leads is a different thing. Temporary insanity, occasioned immediately by drunkenness, does not destroy responsibility for crime where the defendant, when sane and responsible, voluntarily makes himself drunk. To constitute insanity, caused by intoxication, a defense to an indictment or information for murder, it must be insanity caused by chronic alcoholism, and not a mere temporary mental condition. The distinction between a fit of drunken frenzy or madness, commonly called '*delirium tremens,*' and temporary delusional insanity, a disease caused by excessive and long-continued indulgence in alcoholic liquors, technically called '*delirium tremens,*' or '*mania a potu,*' is well defined by the authorities and text-writers. See *State v. Kidwell,* 62 W. Va. 466, 13 L. R. A. (N. S.) 1024, 59 S. E. 494; Wharton & S. Med. Jur. § 940."

In *Miller v. State,* 9 Okla. Cr. 55, 130 Pac. 813, it is said:

"At most, a state of intoxication rendering the defendant incapable of forming a criminal intent would only reduce murder to manslaughter."

Where intoxication is resorted to for the purpose of blunting moral responsibility, it only increases the culpability of the defendant, and a state of intoxication which will reduce the degree of homicide from murder to manslaughter in the first degree must be of such character and extent as to render the defendant incapable of entertaining or forming a design to effect death, and the question is for the jury to determine. A person who commits a homicide while so intoxicated as to be incapable of forming a premeditated design to kill, if he formed no purpose to commit the crime prior to the time he became so intoxicated, is not guilty of murder, but is guilty of manslaughter in the first degree. In this case, upon this issue, the jury under proper instructions found against the defendant, and as we think properly so. The undisputed evidence is that the deceased, in answer to the defendant's question about an hour before the killing, stated that he was unarmed, and that he did not have a gun in the store; that after this the defendant announced that he was going to kill McFerron, "that he had done what he intended to do when he came there," that his pistol was a good one, had it 16 years, and it had never snapped, then went home and told his wife he had killed McFerron. It is true that the defendant testified that he purchased alcohol from the deceased on the day of the homicide; however, in this testimony he is uncorroborated. Upon the whole case we think the evidence is so conclusive as to the guilt of the defendant that nothing can be said in his defense.

There can be no doubt that this crime is murder. The jury had the right to decree his death, but chose the more merciful punishment.

Finding no material error, the judgment of the district of Pontotoc county is affirmed.

ARMSTRONG and MATSON, JJ., concur.