# GENE SWEET v. STATE.

No. A-9529.   Oct. 26, 1939.
(95 P. 2d 242.)

M. O. Counts and Robert J. Bell, both of McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Wallace Wilkinson, Sp. Co. Atty., of Mc-Alester, for the State.

BAREFOOT, J. The defendant was charged with the crime of murder, in Pittsburg county; was tried, convicted of manslaughter in the second degree, and sentenced to serve a term of four years in the penitentiary, and has appealed.

The first contention of defendant is that the evidence is insufficient to sustain the verdict, and that the court erred in failing to instruct the jury to return a verdict of not guilty.

The record in this case contains 557 pages. We shall give only a brief statement of the main facts, which, to our mind, are convincing that the court did not err in refusing to sustain the motion for a directed verdict

The defendant, Gene Sweet, was engaged in the grocery business at Hartshorne, and deceased, Jim Davis, was engaged in the restaurant business at Haileyville, both in Pittsburg county, Haileyville being located between Hartshorne and McAlester. On March 9, 1937, both of the parties were witnesses in a case that was to be tried in McAlester on that date. The deceased phoned defendant

and asked him to come by and pick him up and take him to McAlester to court. Defendant did so, and had with him his son, Marshall Sweet, and Joe Kinnikin, who were also witnesses in the case. After attending court in the morning defendant was asked by one of the lawyers to take some of the witnesses to dinner, including deceased. Just before leaving the courthouse it was suggested by deceased that they get a drink. This was agreed to by all the parties, six in number, and they went in defendant's car to "Peggy's Place", and defendant bought a pint of liquor. All of the parties drank. All testified that there was no difficulty of any kind and all were in a good humor. After eating dinner they returned to the courthouse. About the time court adjourned for the evening, the deceased, Jim Davis, met the son of defendant and asked him if he knew where defendant was, and upon being told that he did not, he said he believed they were back down at "Peggy's Place", and they went down there and found defendant and Joe Kinnikin, both drinking. They went in and all drank. The deceased had carried a bottle of whisky away when they were first there, and he and Marshall Sweet had had several drinks. They stayed there for some time, and played the nickelodeon and some of them danced with a girl who worked there. When they left to go home all of them were under the influence of intoxicating liquor, and pretty drunk. There had been no difficulty or ill feeling of any kind among them. Some outside person had slapped defendant on the back and he resented it, and showed the gun he was wearing in his belt. He had what was known as a "courtesy card" from the sheriff by reason of the fact that someone had threatened to kill him. He had also made the statement that he could shoot a plug out of the nickelodeon that was hung there. There were no ill feelings of any kind between defendant and deceased, and from appearances they were good friends. When they

started home the son of defendant, Marshall Sweet, was driving and defendant was by his side. The deceased was in the back seat directly behind the defendant, and Joe Kinnikin was by his side. When they had gotten out from McAlester, and near Alderson, deceased said something about being a good shot and wanting to shoot at the fence posts. Defendant got his gun out, and said something about having a good boy, but "being a tough son-of-a-bitch himself". Joe Kinnikin reached over and tried to get the gun out of defendant's hand, telling him someone would get killed. In the scuffle inside the car the gun was discharged through the floor of the automobile. All of the parties rolled out of the car, which had been stopped at the side of the road when the first shot was fired. Up to this point there was hardly any conflict in the testimony.

The witness Joe Kinnikin testified as follows:

"A. I will say it this way, he reached over and got this gun and he says 'Marshall is one of the finest boys in the world, I would not want a better boy,' but he said, 'Myself, I am a tough son-of-a-bitch,' and it excited me and I jumped up and over and grabbed the gun and I said, 'Hell, Gene, don't do that, somebody is liable to be hurt', and the firing pin came down and it was an old model Colts gun, hit me on the finger and I jerked my hand back then and Marshall grabbed hold of him at that time and said: 'Dad, don't do that', and I reached back and grabbed him again and the gun fired down to the floor and we kept trying to get the gun away from him and we all scuffled out of the car and Marshall pulled the car to the side of the highway and stopped and we all scuffled on out then onto the highway and the road is slanting there and we fell off this dump and about that time the gun fired again and Marshall said: 'Look, Dad, what you have done, you have killed Jim Davis', and I broke and ran. Q. Any other shots fired? A. Yes, sir, I ran 20 or 30 feet, I would say and the gun fired again, another shot fired. Q. Then you say the second shot killed Jim Davis? A. Yes, sir.

Q. Now, when, while—just before the first,—the second shot was fired there while you were on the ground, what did Gene Sweet say? A. Well, he says, 'Let me up, if you don't let me up I am going to shoot my way up'. Q. How long after that before this gun fired? A. Well, I could not say, it was right immediately. We were not down there very long in the scuffle. Q. What position did Gene have the gun at that time? A. He had it in his hands like this, both hands. Q. Both hands like that? A. Yes, sir, and Marshall had hold of this hand and I had hold of this wrist. Q. You had hold of this hand? A. Yes, sir, the left hand and—(interrupted by counsel) Q. And Marshall the right hand? A. Yes, sir. Q. And Gene had the gun in both hands? A. Yes, sir. Q. Now, you know whether that gun will fire without the trigger being pulled or not? A. The gun will not fire unless the hammer comes back. Q. Well, when the hammer comes back, do you know whether or not it will fire then? A. The trigger would have to be pulled. Q. The trigger would have to be pulled? A. Yes, sir.".

The defendant and his son, Marshall Sweet, both testified as to the scuffling over the gun, and that the gun was discharged accidentally, and by reason of the action of the witness Joe Kinnikin, and not of defendant. That defendant and deceased were the best of friends. That they had traded and visited with each other and nothing had ever occurred to cause any enmity or bad feelings between them. They both testified that the second shot was fired into the air before the witness Joe Kinnikin left the scene of the difficulty, and also the third shot, which they claimed killed the deceased.

After the shooting defendant and his son tried to stop cars to get them to take deceased to the hospital. The gun was thrown by Marshall Sweet about 34 feet to the side of the road, where it was afterwards found by the officers who were told by Marshall Sweet where it was. The defendant got in the car and drove east a couple of miles

where he was overtaken by the officers. His son remained with the body of deceased until the officers arrived.

From the above statement it will readily be seen that the court did not err in refusing to instruct the jury to return a verdict of not guilty. The deceased was killed in a drunken brawl. From the evidence defendant and deceased had been friends, and there is no evidence to show any ill feelings between them on the day of the killing, and up to the very time of the killing. The jury evidently took all of these facts into consideration, and found the defendant guilty of manslaughter in the second degree, and assessed his punishment at four years in the penitentiary. It cannot be said that this verdict was contrary to the evidence. As was said by this court in the case of Skeen v. State, 61 Okla. Cr. 188, 66 P. 2d 1106, 1111, in a case somewhat similar to the case at bar:

"Upon the question of intoxication as a defense, this court has in many opinions discussed this question giving the authorities, not only from the various states, but from the Supreme Court of the United States, and the leading text-writers. These cases distinguish between voluntary and involuntary intoxication and insanity caused by constant intoxication, and as the court expresses it: 'Intoxication cannot operate as an entire exemption from criminal responsibility, and it is not conclusive against the existence of a criminal intent. At the utmost it only extenuates the crime from murder to manslaughter, and it does not do this as matter of law. Whether the accused was so intoxicated as to render him incapable of entertaining the specific intent necessary to constitute the crime is a question of fact for the jury.' See Cheadle v. State, 11 Okla. Cr. 566, 149 P. 919, 922, L. R. A. 1915E, 1031; Collier v. State, 17 Okla. Cr. 139, 186 P. 963, 12 A. L. R. 839; Copperfield v. State, 37 Okla. Cr. 11, 255 P. 590; Huffman v. State, 24 Okla. Cr. 292, 217 P. 1070; Perryman v. State, 12 Okla. Cr. 500, 159 P. 937.

"The evidence in this case shows that the deceased came to his death by reason of a drunken brawl. The evidence clearly shows that the defendant and deceased were drunk at the time of the difficulty. The quarrel between them came up about nothing; there was no ill will nor malice on the part of either of them. The only eyewitness, Levi Peyton, did not see any instruments being used by the defendant in striking deceased. He used only his bare fists." Miller v. State, 9 Okla. Cr. 55, 130 P. 813; Quinton v. State, 53 Okla. Cr. 194, 9 P. 2d 51; Larkin v. State, 55 Okla. Cr. 81, 24 P. 2d 357.

For a reversal of this case it is urged that the court erred in refusing to sustain the motion of defendant to quash the jury panel, and in refusing to grant a new trial by reason of one Leo M. Martin being permitted to serve as a juror. The facts with reference to the jury panel are, that a jury commission of Pittsburg county met on August 16, 1937, and selected 200 names for jury service, and they were placed in the jury box. Upon investigation the court found that they had not been selected in the manner provided by law, and on September 24, 1937, ordered the commissioners to select 200 names. The commission, in compliance with this order, did, on the 28th day of September, 1937, select 200 names and placed them in the jury box. The record does not reveal whether any of the 200 names first selected were among the second 200. We are of the opinion that if the commissioners deemed proper, there was nothing wrong with their selecting those whose names were among the first 200, if they were properly qualified for jury service under the law.

On September 28, 1937, the names of 60 persons were drawn by the clerk and sheriff in the manner provided by law, to report for jury service on October 11, 1937. The case of defendant was set for trial October 18, 1937, and a case of State v. Steve Alexander was set for trial on October 11, 1937. Steve Alexander was a nephew of de-

fendant, and after a conference had by the court and the attorneys representing the state and the defendant, it was agreed that it would be in the interest of a fair trial for defendant that the same jurors should not try both cases. The court then ordered the 60 jurors that had been drawn for jury duty on October 11, 1937, to report October 18, 1937, and a new panel was used in the trial of the case of State v. Steve Alexander, supra. On account of trouble with the heating plant the court continued the case of defendant to October 26, 1937, and ordered the same jury panel to convene at that time. On that date defendant presented a motion for continuance on the ground that his wife was ill and was to be confined. The court overruled the motion for continuance, but continued and reset the case for December 6, 1937, and the same jury panel was ordered to report at that time. On November 22, 1937, a conference was had by the court and counsel for the state and defendant. At this conference counsel for defendant had not filed any motion of any kind, but on the 23d day of November, 1937, filed a motion to quash the panel. On the 26th day of November, 1937, the court issued an order for 25 additional jurors to be drawn from the box, in the manner provided by law, and to report on December 6, 1937, when defendant's case was called for trial. This was in addition to the panel of 60 that had already been ordered to report on December 6, 1937. From these 85 the jury to try the defendant was selected. In the motion to quash the panel, the facts as herein before recited were stated, and also alleged that by reason of the publicity given in the newspapers, and the jurors having knowledge that they had been selected for jury service, that the panel should be set aside, and further alleged that 18 persons named in the panel were residents of or near Hartshorne and Haileyville, where the defendant and deceased resided, and that certain members of the panel,

whose names were unknown, had signed a petition asking the county attorney of Pittsburg county to disqualify in this case. No proof was offered to sustain these allegations at the time the motion was considered. An examination of the record reveals that no juror whose residence was either Hartshorne or Haileyville served as a member of the jury which tried defendant. From an examination of the record we fail to find that the court committed any error, or that defendant was deprived of any substantial right by the overruling of the motion to set aside the panel. Munn v. State, 5 Okla. Cr. 245, 114 P. 272; Maddox v. State, 12 Okla. Cr. 462, 158 P. 883; Oklahoma Statutes 1931, sec. 2981, 22 Okla. St. Ann. § 633.

With reference to the juror Martin, the record reveals that he had served on a jury in October, 1935, wherein a brother of defendant, Cleve Sweet, had been tried for murder. The result of this case was a hung jury. This juror, while being questioned on his voir dire, was asked if he had ever served on a murder case before and he answered, "Yes", and when asked what case, he replied, "the Cooper case". He was not asked directly as to whether he had served on the Cleve Sweet case, or any other case. The same counsel that represented Cleve Sweet was counsel for defendant. We think the juror should have stated that he was a juror in the Cleve Sweet case, but on examination he stated that he did not know defendant; that he had no knowledge of the facts of this case, and there was no reason why he could not give defendant a fair and impartial trial. There was a hung jury in the Cleve Sweet case, and, of course, the record does not reveal whether this juror was for conviction or acquittal. An affidavit of the juror attached to the response to the motion for a new trial states that the juror did not state that he had been a juror in the Cleve Sweet case, because he was not asked that ques-

tion, and that he knew nothing of the facts in defendant's case, only as he read the newspapers, and had no opinion as to the guilt or innocence of defendant. It may be stated that the killing of which defendant was charged occurred during the second trial of Cleve Sweet, but not during the time when the juror Martin was a juryman, but at a subsequent trial. When the killing occurred with which defendant was charged, the court declared a mistrial in the Cleve Sweet case, and the case had not been tried at the time of this trial.

It is urged that counsel for defendant, or the defendant himself, should have recognized the juror, and that not having asked him if he had served as a juror in the Cleve Sweet case, he waived any right he may have had. We can readily see how counsel, or the defendant, might not have recognized the juror.

Where, in a motion for a new trial, it is contended that a juror was prejudiced against a defendant, by reason of having served on a jury in a previous case where the brother of defendant was being tried, and the record reveals that that case did not arise, or grow out of the facts, and was in no way connected with the facts in the case in which defendant was being tried, and the state contests the motion, and attaches to such reply the affidavit of the juror denying that he was prejudiced, and giving his reason for not stating that he was a member of the previous jury, this presents a question of fact to be determined by the trial court, and in the absence of a showing of abuse of discretion, the trial judge's determination of this question of fact will not be disturbed by this court on appeal. Smith v. State, 5 Okla. Cr. 282, 114 P. 350; Spradlin v. State, 13 Okla. Cr. 376, 164 P. 990. Taking all the facts into consideration, we do not think the substantial rights of defendant were denied by the serving of the juror Martin

upon the jury which tried defendant. The record does not show any way in which defendant was prejudiced thereby. Horton v. State, 10 Okla. Cr. 294, 136 P. 177; Johnson v. State, 1 Okla. Cr. 321, 97 P. 1059, 18 Ann. Cas. 300; Fisher v. State, 18 Okla. Cr. 540, 196 P. 724; Bills v. State, 48 Okla. Cr. 233, 290 P. 935; Klugas v. State, 53 Okla. Cr. 212, 9 P. 2d 962; Oklahoma Statutes 1931, section 2998, 22 Okla. St. Ann. § 660.

The next error urged is with reference to remarks of the special county attorney in his opening statement and closing argument. It would unduly lengthen this opinion to give these statements. They have been given careful consideration, together with the cases cited in the brief. We do not find that they are such statements that under the law as announced by this court would cause a reversal of this case. While county attorneys should, in their statements and final arguments, confine themselves to the facts, and the evidence introduced in the case, they have the right to draw their deductions, and unless the statements or arguments are such as to take from defendant his substantial rights, or are such that would arouse the passion or prejudice of the jury, to that extent that they would be swayed from giving a just verdict, the judgment and sentence will not be set aside on appeal. We find no error in the record which would warrant a reversal in this case. Rice v. State, 66 Okla. Cr. 434, 92 P. 2d 857; Williams v. State, 4 Okla. Cr. 523, 114 P. 1114; Morgan v. State, 9 Okla. Cr. 22, 130 P. 522.

It is next urged that the court erred in the admission of incompetent evidence. Many of these objections are to testimony that the court did not permit to go to the jury, but counsel insist that notwithstanding this, it was prejudicial. The fact that certain clothing worn by deceased was permitted to be introduced it is contended was prejudicial.

It was shown that the bullet which killed deceased had passed through the clothing and the hat which was introduced in evidence. Under these circumstances we do not think it was error to permit the clothes to be introduced in evidence. We do not find any error by refusal of the court to permit the testimony with reference to the statement made by the witness Joe Kinnikin to the county attorney.

It is next urged that the court erred in certain instructions given. One of these exceptions was to the court submitting to the jury the issue of second degree manslaughter. We are of the opinion that the facts in this case fully justified the submission of this instruction. Cooper v. State, 61 Okla. Cr. 318, 67 P. 2d 981.

It is further objected to instruction No. 17, upon culpable negligence. This instruction was as follows:

"Culpable negligence is the want of that usual and ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions, and you are instructed that a person handling a deadly weapon will be required under the law to use a higher degree of care and circumspection than in using an instrument ordinarily harmless."

We have many times approved an instruction such as this and think it was proper. Cooper v. State, supra; Swan v. State, 13 Okla. Cr. 546, 165 P. 627; Kent v. State, 8 Okla. Cr. 188, 126 P. 1040; Nail v. State, 33 Okla. Cr. 100, 242 P. 270; Clark v. State, 27 Okla. Cr. 11, 224 P. 738.

The defendant did not offer any special written instructions. After the instructions had been read to the jury by the court, counsel for defendant made a statement to the court, with reference to the court charging the jury that, if the killing occurred by reason of the act of one

or more parties and not defendant, defendant should be acquitted. No written instruction to this effect was offered by defendant.

The defense in this case was that of accidental homicide. The court fully presented this issue to the jury, and advised them that "if they entertained a reasonable doubt as to whether or not the killing of deceased was accidental or occasioned by misfortune in the doing of a lawful act by lawful means with usual and ordinary care and caution, and without any unlawful intent", then it would be their duty to resolve said doubt in favor of defendant and return a verdict of not guilty. This instruction, together with the other instructions given, fully presented the issue of accidental killing.

We have carefully examined all of the instructions and find that they covered every phase of the law as applied to the facts in this case, and fully protected every right of the defendant.

Finding no error we are of the opinion that the judgment of the district court of Pittsburg county should be affirmed, and it is so ordered.

DOYLE, P. J., concurs. DAVENPORT, J., dissents.

DAVENPORT, J. (dissenting). The evidence may be sufficient to sustain the judgment if the defendant was accorded a fair and impartial trial by the court and an unbiased jury. However, I cannot agree with the majority of the court that the juror Leo M. Martin was a competent juror under the facts as disclosed by the record.

In my opinion the defendant's motion to quash the panel of jurors should have been sustained. It is shown by the record that prior to the witness Leo M. Martin being called as a juror in this case, he sat in the trial of a case of the brother of this defendant, and that the jury in the brother's case failed to agree upon a verdict.

It is further shown by the record that at the time of this killing, Steve Alexander, a nephew of the defendant, was on trial for murder, and the presiding judge at the trial of Alexander ordered a mistrial because of the killing of Davis by the defendant in this case, while the Alexander case was being tried.

When the juror Leo M. Martin was examined on his voir dire, he was asked if he had ever sat in a trial of a murder case, and he answered, "Yes." He was asked what case, and he said the Cooper case.

In response to the motion to quash the panel of jurors on the ground that Leo M. Martin was not a qualified juror by reason of the fact that he had been a juror in the trial of the defendant's brother on a charge of murder, the juror gives as an excuse as to why he did not tell he had been on the Sweet jury, who was the brother of this defendant, that they did not ask him.

In my opinion the question submitted to the juror Leo M. Martin as to whether or not he had ever sat in the trial of a murder case prior to the time he was called in this case was sufficiently plain that he should have answered that he had not only sat in the Cooper case, but in the case of Sweet where the jury failed to agree.

There is nothing in the record to show how the juror Martin voted in this first Sweet trial, nor does it disclose how he stood on the trial in this case.

It may be that the juror was not biased or prejudiced against this defendant, but in my opinion he should have told the court and lawyers when he was being interrogated on his voir dire that he had sat in the trial of the Sweet case, where no verdict was rendered.

If he had made this disclosure to the court and the

attorneys in the case, I am sure that he would have been excused from the jury panel.

In my judgment, it is a human impossibility for a man to sit in the trial of a case, even though the jury did not agree, and afterwards called in another case to sit in a trial of a man of the same name as the first, that the juror would not remember that fact, and so state to the court and attorneys examining him when questioned specifically as to whether or not he had ever sat in the trial of a murder case.

It is unexplained by the juror as to why he could remember why he sat in the trial of the Cooper case and did not answer that he had sat in the Sweet case. He attempts to say that he was not asked about the case. He was not asked about the Cooper case either, but in his answer on his voir dire he stated that he sat in the Cooper case.

The juror Martin may have gone into the jury box unbiased and unprejudiced against this defendant. No one can say when the testimony began to develop and disclose that this defendant had the same name of Sweet that the juror had sat in the trial at a time prior to the time called to sit on the jury in this case, what facts were recalled to the mind of the juror of the previous trial and what impression it made upon his mind, and whether or not it caused him to be biased or prejudiced against the defendant.

In my opinion, Leo M. Martin was not a competent juror to sit in this case, and that it would be a bad precedent to follow in the trial of criminal cases to let a juror sit in one case, and then when a relative or brother later is called for trial in another murder case, to fail to answer specifically as to the murder cases in which he has sat as a juror.