Dallas Quinton SHARP, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13554.

Court of Criminal Appeals of Oklahoma.

Oct. 27, 1965.

Rehearing Denied Nov. 24, 1965.

**596**

H. C. Ivester, Sayre, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Charles L. Owens, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

Dallas Quinton Sharp, hereinafter referred to as the defendant, was convicted for the crime of murder, and on May 20, 1964 by the judgment of the district court of Beckham County, Oklahoma, was sentenced to suffer death by electrocution on August 15, 1964, within the walls of the State Penitentiary at McAlester, as by law provided.

The court-appointed attorney for the defendant has perfected his appeal to this Court.

The penal code of Oklahoma Title 21 O.S.A. § 707, provides:

"Every person convicted of murder shall suffer death, or imprisonment at hard labor in the State Penitentiary for life, at the discretion of the jury. Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor, and the judgment of the court shall be in accordance therewith. But upon a plea of guilty the court shall determine the same."

In the case at bar, the defendant was tried before a jury in a court of competent jurisdiction, was represented by competent counsel, was advised of his constitutional rights; was found guilty of the charge of murder, and sentenced by the jury to the punishment of death, as provided in the state statutes.

After reviewing the record submitted to this court, we are of the opinion that the defendant was provided all the formalities of law essential to the taking of human life, and that his trial, conviction and sentence of death has been in accordance with the law of Oklahoma.

In his petition in error counsel cites twenty-three assignments of error, which he treats in his brief under four general assignments. After discussing the proceedings of the trial of this defendant, we shall consider the defendant's petition in error, as outlined in counsel's brief supporting that petition.

It appears from the record submitted to this court that the defendant, Dallas Quinton Sharp, was charged with the murder of his wife. The information filed against him alleged in substance that on the evening of December 10, 1963 the defendant did, with premeditation, kill his wife. The defendant was arrested and committed to the Beckham county jail early on the morning of December 11, 1963. He was afforded a preliminary hearing on December 20, 1963 and was bound over for trial in the district court of Beckham County.

The district court appointed Mr. H. C. Ivester to represent the defendant at his

trial. On December 23, 1963 the defense counsel filed an "Application for Medical Attention", in which he requested that the defendant be committed to the Western State Hospital at Fort Supply, Oklahoma, for ninety days observation to determine his mental condition. On December 24, 1963 in open court and preliminary to arraignment in the district court, at which the defendant was present with his attorney, as well as with his father and mother, the following transpired:

The defendant admitted his true name as charged, and stated his age to be thirty-one years. The court advised the defendant that he was charged with a felony, murder, for which the punishment prescribed by law is life imprisonment or death. He was then advised by the court of his constitutional rights, his right to counsel, and the consequences of his plea. At the same hearing, the court formally appointed Mr. Ivester to serve as his defense counsel. The court then ordered that the defendant be committed to the Western State Hospital at Fort Supply, Oklahoma, for ninety days observation, to determine his mental competence to stand trial.

On February 13, 1964 the report from the Western State Hospital, signed by H. B. Witten, M. D., Superintendent, was filed with the district court clerk. That report stated:

"In the opinion of our staff Quinton Dallas Sharp is competent in the legal sense of the term. He knows the difference between right and wrong and is capable of assisting in his own defense. We feel that his case should be dealt with by the court, rather than by committing him to a mental hospital."

The district court, following the defendant's release from the Western State Hospital, set the defendant's arraignment for 10:00 A.M., Wednesday, February 19, 1964. On that day, prior to his arraignment, in open court, at which the defendant was present with his counsel, the defendant was advised by the court that he might have an additional 24 hours to answer the information which had been filed against him. The defendant waived his right to have 24 hours in which to plead, waived the reading of the information, and entered his plea of not guilty.

April 23, 1964 the defendant filed his demurrer to the information, contending that the wording of the information was not sufficient to charge the defendant with the crime of murder, and that the allegations were insufficient upon which to force the defendant to stand trial for murder.

On the same day, the defense counsel filed a second "Application for medical attention", in which he contended the defendant was entitled to receive medical care, which was not provided him at the Western State Hospital.

The defendant then, on the same date, filed an application for change of venue, contending that he could not receive a fair and impartial trial in Beckham County.

A hearing was had May 1, 1964 on the defendant's demurrer to the information, his application for medical attention, and his application for change of venue.

The defendant waived his application for change of venue, defense counsel stating: "I filed an application for change of venue, just for a matter of record. I then talked with the defendant in the case, talked with his father, and they are persuaded to believe they can get just as fair a trial in Beckham County as anywhere, because they felt like that this is where their friends are, and where the court-appointed lawyer could probably do his best; and that is a matter of making a record in the case."

The court overruled the defendant's demurrer to the information for the reason that it was not timely filed. The court then ordered that the defendant be examined by two local physicians, and to be provided such medical care as the doctors determined necessary. The trial of the defendant was then set for May 11, 1964.

On the opening day of the trial, defendant was permitted to withdraw his plea of

not guilty for the sole purpose of permitting the court to consider his demurrer to the information. The court overruled the demurrer, and the defendant again entered his plea of not guilty.

At the trial, the State was represented by Mr. V. P. McClain, county attorney, and Mr. Ira Monroe, special prosecutor. The defendant was present and was represented by his court-appointed counsel, Mr. H. C. Ivester.

The jury was properly selected, and the case proceeded to trial. In the selection of the jury, the court qualified two additional jurors to be available and to serve in the event any of the regular jurors became disqualified, due to sickness, etc. The complete jury was qualified during the second day of the trial, and the state commenced its case against the defendant.

The information filed against the defendant alleged in substance the following: that on December 10, 1963, Dallas Quinton Sharp did unlawfully, wilfully, wrongfully and feloniously, without authority of law, and with a premeditated design to effect the death of one Edna May Sharp, make an assault in and upon her by beating her with a club, and with his fists, and by stomping her with heavy boots and by throwing a heavy log forcibly against her body, did then and there and thereby inflict certain mortal wounds in and upon her head and body of which said mortal wounds so inflicted caused her death on December 10, 1963; and that the defendant inflicted such assault intending to cause her death.

As provided by statute, the information was read verbatim to the jury.

The facts revealed by the testimony show that on the day in question the defendant received pay for work he had performed, and went into town to buy some groceries. In the process, he stated he also purchased some whiskey, wine, and some beer, and returned home. The weather was bad in that it was cold, and later in the day the temperature fell to a point below freezing, and sleet fell, making it difficult to travel on foot or by automobile.

Mr. and Mrs. Sharp had five children, the oldest child being a girl, Brenda Darlene, who was ten years of age when this crime was committed. The next child was a son, who was eight years of age that fateful December day. The other three children were seven, three, and one years of age, respectively.

The principal witness against the defendant was his daughter, Brenda Darlene, who at the time of her testimony was eleven years old.

December 10, 1963 the eldest child, Brenda Darlene Sharp, as she testified, returned home from school about four o'clock in the afternoon. When she reached home, her father was asleep on the divan. Her mother told her and her eight year old brother to go outside and cut some firewood, which they did. After they completed the job and carried the wood in, they were told by their mother to "get ready to eat."

But, the daughter testified, before they could get ready to eat, the defendant came into the kitchen, knocked the dishes off the table, knocked his wife down and hit her. He then threw a jelly jar at his wife, and continued hitting and stomping her. In the process, he tore all of her clothing off, and left her lying nude in the kitchen.

Brenda Darlene testified that she commenced to cry, and as she stated in her own words, "Then after that he told me to shut up, and I couldn't help it, so he went and slapped me and knocked me down. Then after that he went and told us to go in the front room, so we went in the front room, and after that he went in the front room and he set down, and mamma got up and went in the bed room, and he told me to go get her, so I went and got her, and she didn't have no clothes on. She said, 'wait a minute', so he waited, and she almost fell before she got there, and then she took another step and she fell". The special prosecutor asked, "Then what happened?"

As the young witness answered the question, she commenced to unveil a most sordid, cruel, and unnecessary crime. In summarizing this testimony, she stated that the defendant took a drink; then he got up and started stomping her mother, as she lay on the floor; he picked up a piece of fire-wood, and commenced hitting her mother on her legs and her head; intermittently, he continued to stomp her with his boots. He then told the children to go to bed, and the four youngest did go to bed, but Brenda Darlene stayed in the living room. She stated: "and after that he throwed her outside by the head of the hair, and kicked her out there. Then he told me to come and get her, and I couldn't get her, and I told—". Her testimony was interrupted by the question, "What was that, he told you what?" She answered, "To go get her". The prosecutor asked, "Did you try?" The young witness replied, "Yes".

In response to another question concerning the situation, of her mother lying on the front porch in the nude, the witness testified, "I went out there and daddy was right at the door, and she didn't say anything, she kept on grunting, and then he told me to bring her back in, and he told me to come back in, and I come back in, and I told him, or asked him, if he would go get her, and he said 'OK', but he never did go get her. Then he told me to roll him a smoke, so I rolled him one." The astonished prosecutor exclaimed, "What?", to which the witness replied, "Told me to roll him a smoke, and then after that I rolled him one but it came all to pieces, and he told me to roll him another one, and I did. When I did, he smoked that, and he never did go after her. Pretty soon I rolled him another one and he went out and got her, and brought her in by the head of the hair, and kicked her again."

The prosecutor asked, "Then what happened?" The young witness replied, "Then he brought her in, and kept stomping and hitting her with some wood, and that big chunk there, he throwed it at her. I know

it hit her, she hollered and she didn't holler no more. Then he went and set back down, and then told me to go to bed, so I went to bed. He was setting there again when I come in and he said, 'What happened to mamma, what happened to mamma?' and that is all I remember. He told us [witness and her eight-year old brother] to go after, Mr. Swafford [a neighbor], and so we went and he wasn't home, and Mr. Mikles—we went to Mr. Mikles' home and asked him if he knew where Mr. Swafford was, and he said he wasn't home. So they gave us some hot chocolate and stuff, and took us home. I told him he wanted us, daddy wanted us to get grandpa, so he brought Quinton and I home, and he went and got grandpa; and he told us to go to bed. I couldn't go to bed, I went in and tried to clean up the kitchen, but I couldn't."

Mr. Mikles testified that he drove the children home in his pickup truck, and then drove the defendant to get his father. Later he returned to the defendant's home with the two of them.

That evening at the hospital the doctor took a sample of defendant's blood, for the purpose of having a blood-alcohol test made. The report from the Oklahoma State Bureau of Investigation indicated that the test revealed 0.27% by weight, according to the Helse Method of testing. The doctor testified that the blood sample was taken some time after midnight, early in the morning of December 11, 1963.

The State introduced the testimony of eight witnesses. Their testimony showed how the defendant got the money he spent in town, when his employer testified that he paid him that day, and drove him to town.

The doctor testified concerning the condition of the body when he examined it on the floor of the defendant's house.

The undertaker testified as to the condition of the body, when he returned to the funeral home with it, and when he embalmed the body.

Mr. Tom Mikles testified concerning the two children, after they reached his home,

in search of Mr. Swofford, and to his subsequent activities while driving the defendant to defendant's father's home. He further testified to assisting the sheriff in taking the defendant to jail.

The undersheriff testified concerning his investigation and the finding of a half empty half-pint bottle of whiskey, one empty wine bottle, a half empty wine bottle, and one full wine bottle in the home.

The Highway Patrol trooper testified in substance that he rode to the scene of the crime with the undersheriff, the condition of the body when the doctor uncovered it to conduct an examination, and to the general scene.

The sheriff testified concerning his investigation, and that when he commenced to look around the house the defendant informed him to get out, that he couldn't search his house without a search warrant. He stated further that the next morning in the defendant's jail cell, he asked the defendant, "You remember what happened last night?" and the defendant answered, "Yes". The sheriff said, "You know your wife won't be with you any more?" and the defendant again said, "Yes".

The defense introduced the testimony of six witnesses, including that of the defendant, who took the stand in his own defense. Most of the witnesses for the defendant testified concerning the defendant's drinking habits, and attempted to show that the defendant was an alcoholic.

The defense also introduced the blood-alcohol report from the State Bureau of Investigation, in an effort to show the defendant was intoxicated beyond the point of reason. The doctor who examined the defendant after midnight and prior to his being placed in the county jail testified concerning the defendant's condition at that time.

On direct examination the defense counsel asked the doctor, "Did you make any additional examination?" to which the doctor answered, "yes". Defense counsel then asked, "Alright, tell the jury what?" The doctor responded, "Well, mentally he was a bit clouded, I would say he was hostile, but cooperative; as far as examination his physical signs were all normal, blood pressure and all of that were completely normal. His speech, I would describe as slurred, but you could understand him well; and the blood, I discussed the drawing of blood with Mr. Sharp and he was agreeable, so we drew the blood at the time of the examination, but he co-operated with me well. When I say hostile, he didn't want to be rushed into anything, but as far as co-operating, he co-operated with me quite well."

The doctor testified that he administered the shot to the defendant at the time of the examination, because he knew if he didn't do it then, he would be called upon later to administer one at the jail. He stated on re-direct examination by the defense counsel that he recognized sufficient hostility to cause the defendant to be upset, once he found himself in the jail cell. He stated that he did not give the defendant the shot because he was hysterical, but because he was hostile.

On direct examination the defendant's father testified that when the defendant reached his home, after Mr. Mikles drove him there, it was about ten or eleven o'clock at night, that he was already in bed asleep. His testimony continued, "Well, he come on to the door and come on in, and I could tell that something bad was wrong with him. So he said, 'Daddy, I think Edna May is dead'. I said, 'Son, did you hit her?' He said, 'No, daddy, I didn't touch her.'" He further stated that the defendant walked with him to the pick-up truck; he verified the statement of the doctor concerning the blood sample, but stated that the defendant didn't want to permit the taking of the sample, until after he talked with him.

The substance of the defendant's testimony was that he didn't remember anything of what transpired. He stated that the first time he went to town he bought some things for the children, an order of groceries, and a half-case of beer. The next

time he went to town he bought a half pint of whiskey, and three fifths of wine.

He contended that he had been drinking since he was about sixteen years old, and that his principle drinking at the time was wine; and the preceding four or five years he had been drinking quite a bit more. On direct examination concerning his return from town that afternoon the defense counsel asked, "Do you remember when you got home?" To which the defendant answered, "I can remember, I believe I told my wife 'I am back early', and she laughed." The defense counsel then asked, "What is the next thing you remember?" The defendant responded, "It seemed like I can remember something, trying to give me a blood test. There is something there I don't know, whether it was before or wasn't."

Later the defense counsel asked the defendant, "When did you first learn your wife was gone?" The defendant answered, "I didn't believe any of it right at first, I thought I was in jail again for being drunk, thought maybe they had me in jail for assault and battery, but I thought I was in the Elk City jail."

Defendant was asked, "You are telling this jury that you don't remember, as they have testified, of beating your wife and kicking her?" He answered, "I don't remember kicking my wife, or of hitting my wife."

The defendant in his brief considers his assignment of errors under four general propositions: (1) The court erred in giving the instructions; (2) the error and prejudicial remarks of the prosecuting attorney; (3) the court erred in overruling defendant's demurrer to the information, covering that part which charged premeditated murder; (4) the question of intoxication.

Considering the defendant's first proposition, as it pertains to the court's instructions to the jury, we fail to see the merit of defendant's objections. We believe the court's instructions adequately state the law applicable to the facts of this case. This Court stated in Barber v. State, Okl.Cr., 388 P.2d 320:

"All instructions given by the trial court should be considered, and where they fairly and fully present the issues involved, and no fundamental error occurs whereby the defendant has been prejudiced or deprived of a substantial right, the case will not be reversed on appeal."

See also Cody v. State, Okl.Cr., 376 P.2d 625, and Young v. State, Okl.Cr., 357 P.2d 562.

Defendant complains specifically about instructions Nos. 3, 10 and 11. In each instance he picks out separate words, or the arrangement of sentences within the instruction, of which he complains, contending that they do not sufficiently state the law, in behalf of the defendant.

We must agree with the Attorney General, who cites in his brief Bennett v. United States, 252 F.2d 97, in response to the defendant's complaint concerning certain words and arrangement of sentences within the instructions of which he complains. The United States Tenth Circuit Court states in that case, which arose from the State of Oklahoma, in the syllabus to the opinion:

"3. Instructions must be considered as a whole and individual sentences should be considered in light of entire charge."

\* \* \* \* \* \*

"5. Questioned words in an instruction should be interpreted in favor of consistency with remainder of instruction rather than isolated to create conflict within instruction."

See also: Stanford v. State, Okl.Cr., 363 P.2d 515, and Byington v. State, Okl.Cr., 363 P.2d 301.

In Instruction No. 3, defendant specifically complains of the use of the word "satisfactorily", wherein the court concluded the instruction concerning the presumed innocence of the defendant by saying:

"[I]f after duly considering all the evidence, you entertain a reasonable

doubt as to whether his guilt is satisfactorily shown by the evidence, you should find the defendant not guilty."

■ In Instruction No. 10 defendant complains of that part which recited, " * * unless the proof on the part of the prosecution tends to show that such homicide amounts only to manslaughter * * *", and states in his brief, "we believe it was the court's responsibility to find there was no evidence or proof on the part of the prosecution tending to show anything other than homicide amounting to manslaughter in the first degree, * * *".

However, it was within the court's province to determine whether or not that question of fact should go to the jury.

■ And then in Instruction No. 11, the defendant picks out separate words, to-wit: "excuse", "may", and "solely", in an effort to disqualify the instruction in its entirety. We cannot accept this reasoning, but instead rely on the rule stated in Bennett v. United States, supra.

Defendant complains of Instruction No. 5, which he contends prejudiced the rights of this defendant, in which the court, as the first paragraph of the instruction, recited verbatim the first paragraph of Title 21 O.S.A. § 701, which reads:

"Homicide is murder in the following cases:

"1. When perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being."

The second paragraph of the instruction recites Title 21, O.S.A. §§ 702 and 703 in one paragraph both of which are intended to define the provisions of section 701. These sections read as follows:

" § 702. Design to effect death inferred.

"A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed."

"703. Premeditation.

"A design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution."

■ This court held in Barfield v. State, 71 Okl.Cr. 195, 110 P.2d 316:

"An instruction defining a statutory offense should be in the terms of the statute or in words of similar import."

■ Also in Adams v. State, 43 Okl.Cr. 179, 277 P. 688, this court said:

"Instruction setting out statute on which prosecution was based practically in language of statute is not erroneous."

■ It was not, therefore, erroneous for the court to recite those pertinent parts of the statutes verbatim, which pertained to the facts of the case at hand.

■ The defendant then in addition complains of the court's Instruction No. 15, concerning the testimony of certain "expert witnesses". He contends that the instruction tends to "soft pedal" expert testimony offered in behalf of the defendant. In that instruction the court briefly defined the meaning of an expert witness, and then instructed the jury as follows:

"You are instructed that you may consider the testimony of these witnesses, and give it such weight and value as you think it should have, but the weight and value to be given their testimony is for you to determine. You are not required to surrender your own judgment to that of any person testifying as an expert, for the testimony of an expert, like that of any other witness, is to be received by you and given such weight and value as you deem it is entitled to receive."

■ This court held in Dare v. State, Okl.Cr., 378 P.2d 339:

"The testimony of experts is not conclusive on the issue of mental capacity since the law makes no distinction in weighing evidence between expert testimony and evidence of other character."

See also: In re Smith, Okl.Cr., 326 P.2d 835.

■ And in Harvell v. State, Okl.Cr., 395 P.2d 331, this court said:

"The weight and credibility of the opinion of the expert is a question for determination of the jury."

As for defendant's second proposition: "The error and prejudicial remarks of the prosecuting attorney", we observe from the record that it contains only the opening and closing remarks of the prosecuting attorney, and not that of the defense counsel. We also observe that counsel did not object to the parts of the prosecutor's argument of which he now complains.

■ This court held in Young v. State, Okl.Cr., 357 P.2d 562:

"Counsel for a defendant must not only object to alleged improper statements of county attorney in his argument to the jury, but he must go further and move the court to exclude such remarks from the jury and instruct them not to consider them for any purpose, when this is done, such remarks do not constitute reversible error, unless the remarks were of such a character that the error would not be cured by a withdrawal of the remarks."

See also Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927.

■ With reference to the failure of the record to report the argument of both the county attorney and the defense counsel, the court continued in the Young case, supra, quoting with approval from Hathcox v. State, supra:

"Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel."

■ The court continued, while referring to Walker v. State, 91 Okl.Cr. 1, 214 P.2d 961–962, and repeated the rule laid down in that case as follows:

"When the entire argument on both sides is not before the court, and the county attorney contends that his argument is in reply to argument advanced by defendant's counsel, and the trial judge overrules the objection to such argument, this court will not pass on the alleged error, unless the argument complained of constitutes a violation of some constitutional or statutory right of the defendant. Under such circumstances the presumption will be indulged on appeal that the trial judge ruled that such argument was permissible as reply argument, as the burden is upon the appellant to affirmatively show error in the ruling of the trial court."

■ In the instant case, the objections were not properly made at the time of the alleged misstatement. Likewise, in the prosecutor's closing argument, he made reference to comments made by the defense counsel. For these reasons, therefore, we must conclude that this assignment of error is without merit.

Defendant's third proposition: "The court erred in overruling defendant's demurrer to the information, covering that part which charged premeditated murder."

■ The record reveals that the demurrer was first overruled because it was not timely filed. And then later, the court permitted the defendant to withdraw his plea of not guilty, for the purpose of hearing defense counsel's argument supporting his demurrer. The court then overruled the demurrer the second time, and permitted the defendant's plea to be entered again.

■ In Barber v. State, Okl.Cr., 388 P.2d 320, this court laid down the rule:

"In ruling upon demurrer to information, it was only incumbent on trial court to determine whether information was reasonably certain as to of-

fense charged and was couched in such language as to enable a person of common understanding to know what is intended so that he may prepare his defense, and so that a judgment of acquittal or conviction would be a bar to a subsequent prosecution for the same offense."

See also Johnson v. State, 79 Okl.Cr. 71, 151 P.2d 801.

The court has carefully examined the trial court's instructions to the jury, and finds that they sufficiently cover the questions complained of by the defendant. The court instructed the jury concerning murder, as well as both degrees of manslaughter. This court recited the rule, as shown by the syllabus, in an early case, which was later included in the state statutes, in Collier v. State, 17 Okl.Cr. 139, 186 P. 963, 12 A.L.R. 839:

" * * * [E]vidence of intoxication is admissible to show an absence of the premeditated design to kill, for the purpose of determining whether the offense was murder or manslaughter, and a state of intoxication which will reduce homicide from murder to manslaughter in the first degree must be of such character and extent as to render the defendant incapable of entertaining or forming a design to effect death. *And this question is for the jury to determine.*" [Emphasis added.]

The defendant's fourth proposition is stated: "The question of intoxication".

Notwithstanding the defendant's complaint concerning the court's instruction No. 11, it is quite clear that the court properly presented the question of the defendant's condition of intoxication. As stated in Collier v. State, supra, this is a question of fact for the jury to determine. Defense counsel quotes the statement made by the chemist from the State Bureau of Investigation, concerning the results of the blood alcohol test. He said, "Most people are approaching comatose at that level". We have no doubt that the statement is cor-

rect. However, from the record one cannot reach the conclusion that this defendant was approaching that condition. We must conclude, therefore, the question was properly presented to the jury. In this case upon this issue, the jury under proper instructions found against the defendant, and we think properly so.

Briefly commenting upon the other assignments of error, specifically listed in the petition in error, after careful examination of the record, we must conclude that they are without merit. Assignment No. 4 pertaining to the application for change of venue, the defense counsel admitted it was for the record only. Likewise his fifth assignment, which complains of the jury panel, is without merit. The record clearly shows that the defendant considered his best chances were with his friends of Beckham County.

We cannot accept his sixth assignment of error, that the daughter should not have been permitted to testify. The record clearly indicates that the eleven-year old daughter at the time of the trial spoke with intelligence and knowledge. The chronological age of a person is nothing more than a guide. Likewise, she was there when the murder was committed. It has long been the general rule that one who can comprehend the difference between right and wrong is capable of testifying as a witness. This child clearly indicated that capability.

Insofar as his seventh assignment is concerned, it is within the judicial discretion of the trial court as to whether or not he will sustain or overrule a motion for a directed verdict. Under the facts of this case, the judge did not abuse that discretion by submitting the case to the jury.

The remaining assignments are found to be without merit. We have carefully examined the defendant's requested instructions and find that they were sufficiently encompassed within the court's instructions, when considered as a whole. Also, we find that the defense counsel failed to object

to the introductory questions posed by the trial judge, when the jury panel was being selected. After examining that part of the record, we conclude that the judge did not abuse his discretion in this respect.

We are of the opinion that the defendant's crime is murder. The jury had the right to decree the death penalty. And, therefore, finding no material error, the judgment of the district court of Beckham County is affirmed.

The original time for execution having passed, owing to the pendency of this appeal, it is considered, ordered and adjudged that the judgment and sentence of the district court of Beckham County be carried out by the electrocution of the defendant on Friday, the 21st day of January, A.D. 1966.

BUSSEY, P. J., and NIX, J., concur.