Cecil Francis MASSEY, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant In Error.

No. A-12065.

Criminal Court of Appeals of Oklahoma.

Jan. 12, 1955.

John L. Ward, Jr., Harold M. Shultz, Jr., Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Cecil Francis Massey, plaintiff in error, hereinafter referred to as defendant, was charged by indictment in the district court of Tulsa County with the crime of murder; was tried before a jury and found guilty of manslaughter in the first degree, and his punishment fixed at thirty-six years in the State Penitentiary. Appeal has been duly perfected to this court.

For reversal but two questions are raised and argued in brief:

"Proposition No. 1. Did the trial court err in refusing to grant a new trial because of the inflammatory and prejudicial remarks of the county attorney?

"Proposition No. 2. Was the punishment as set by the jury excessive and given under the influence of passion and prejudice?"

While no complaint is made as to the sufficiency of the evidence, a summary of the testimony will be helpful in considering the issues raised.

The indictment found by the grand jury sets out that on May 29, 1953, Cecil Francis Massey with a premeditated design, etc., to effect the death of one Dennis Potter did stab and cut Dennis Potter in the back and in the left side below the heart, with a pocket knife, etc., from which stabbing and cuts Dennis Potter died, etc.

The record is voluminous, a total of 17 witnesses having testified. As briefly as we may point out, the State produced evidence that in the community of Dawson, a part of Tulsa and located in Tulsa County, there was a bar or beer tavern known as Jackson's Bar, then operated by one Tom Calvert. That the defendant entered this Bar about 7:15 p. m. on May 29, 1953, sat down at the counter at about the center of the bar, and ordered a bottle of beer; that Dennis Potter was sitting at the south end of the bar, the bar being "L" shaped; that Potter was drinking beer with two women, Avis Taylor and Louise Wager; that defendant sat next to a woman by the name of Vera Gilbert, who sat on the next stool to the north, and a man named Dodson was sitting on the stool south of the defendant. There were a number of other persons in the Bar. Dennis Potter had been in and out of the Bar since about 10 o'clock that morning, and had played shuffle board with the other customers, including one of the girls who was sitting with him when the defendant entered the Bar. Potter and the two girls were talking and laughing and the defendant seemed to think that he heard some of their conversation, and to take offense, although neither Potter nor the woman had addressed any remarks to the defendant up to that time. That defendant said to Potter and the two women, "If you are talking about what I think you are, you better shut up". This admonition was repeated and the Bar maid asked the defendant to stay out of the conversation and reported the argument to Tom Calvert, the Bar owner, who cautioned both Massey and Potter not to argue in his place, and both said there would be no trouble there. That the Bar maid heard Potter utter the words, "son-of-a-bitch" but did not know whether the remark was addressed to the defendant or not, but that at any rate the defendant reached in his right-hand pocket, pulled out a knife, opened it in his right hand, got off the stool and started toward Potter. That one or more persons hollered out, "Tom, he has got a knife" and Calvert attempted to stop defendant from reaching Potter, but defendant pushed Calvert aside. That Dennis Potter started back and was side-ways to Massey when Massey got up to his end of the counter, and that Massey struck him in the right center of his back with the knife he was holding in his right hand. That Potter then turned and tried to defend himself by pushing the defendant away, and that Calvert grabbed hold of the defendant from behind and attempted to pull him away and Massey fell backwards against a table, which slid back, and then he came up and cut Potter in his heart, causing the blood to spurt out and on to defendant; that defendant then ran out of the door and ran down and disappeared in an alley. That Potter staggered to the bar, leaned on it with his elbows and then collapsed to the floor and died.

The defendant was later on apprehended when he entered the home of a brother some five miles from the Jackson Bar, and he was found to have a knife in his possession with blood on it.

No weapon of any kind was found on the deceased or on the floor of the Bar, and no witness for the State or the de-

fendant, except the defendant himself, claimed to have ever seen the deceased with a knife, but practically every witness saw defendant with a knife in his hand when he got off the stool and started toward the deceased.

The evidence is undisputed that the deceased and the defendant were unacquainted and were strangers each to the other; that the deceased was in his early twenties and the defendant was 31 years of age, married and the father of two children.

The defendant testified that he had lived in Tulsa six years, was a plumber and that on the evening of May 29, 1953 when he visited the Jackson Bar he had a little earlier gotten off from his work and had on his work clothes. That he had prior to 1950 lived in Dawson, for a while but had moved to another part of town; that he and a fellow-worker, Andy Dodson visited Dawson that day, going to the West End Beer tavern, where they drank beer and played shuffle board, and there he met Vera Gilbert, who he said was an old friend of his and his wife; that he drank beer with her and played shuffle board with her for about forty-five minutes, then went to the Thompson Bar and then across the street to the Jackson Bar. That he stopped a minute at a barber shop and Vera Gilbert went in the Jackson Bar ahead of him; that he ordered three beers, for Dodson, Vera Gilbert and himself. That he noticed Dennis Potter, whom he said he had never seen before, and two women at the opposite end of the bar laughing and he thought they were making fun of Vera Gilbert; that he thought they were saying something about a sweater that she was wearing, it being a pink sweater and tight and she being a rather large woman with large breasts. Defendant said, "I told him if he was talking about what I thought he was, to knock it off." Defendant testified that he said nothing further to Potter, and did not know whether Potter heard him, but that later Potter said, "I thought we told you—we run you out of Dawson once, you dirty son-of-a-bitch." Defendant then said when he lived in Dawson some member of his family had had trouble with a boy named McGills, and McGills had threatened him when he lived there, but he had never heard of or seen Potter before. He said the Bar maid came over and asked him to leave, and he told her he would when he finished drinking his beer. Witness claimed that he did not have any conversation with Tom Calvert. He said that Potter said: "I will put the dirty son-of-a-bitch out", and started from around the end of the counter, that defendant commenced to get off the stool and Tom Calvert hit him and knocked him to Dennis Potter and that Potter hit him and he was knocked down on the floor. Witness was asked by his counsel the leading question as to whether he ever saw a knife in the hand of either Dennis Potter or Tom Calvert, and answered that he did, without specifying which of the persons held the knife or at what time he saw it with reference to the other events. Defendant said that he was trying to get up off the floor and Calvert said: "Kill the dirty son-of-a-bitch" and that Calvert grabbed hold of him by the shoulders from the rear and that Potter was over him and there for the first time he got his knife out of his pocket. That he had previously seen Potter with a knife and was afraid, and he swung his knife as he was getting up off the floor, and he did not know how many times he swung his knife or when Potter and Calvert got cut. Witness claimed that he ran out of the place to keep from getting hurt and walked five miles to his brother's where he was arrested.

Witness further stated that at the police station later that night one of his lawyers pointed out some bruises and lacerations on his face and he found that he had a cut place in the left pocket of his shirt and claimed that prior to his fight his shirt was not cut.

Witness had stated that he had never been convicted of any crime, but on cross-examination it developed that he had been convicted of drunkenness, reckless driving, and also of disturbing the peace.

On cross-examination defendant explained that while he was raised up off the

floor and while Potter was over him that he reached up over Potter and struck Potter in the back with his knife in an effort to keep Potter from cutting him. Defendant said that he then got up and struck at Potter again as Potter advanced toward him but did not know whether he struck him or what happened.

Witnesses for the defendant testified that the cut in defendant's shirt pocket was a knife cut. Other witnesses testified as to his good reputation in the neighborhood where he lived.

■ While there was conflict in the evidence as to just what remarks passed between the deceased and the defendant, the evidence was overwhelming that defendant got his knife out and opened it and advanced on Potter and stabbed him, and that defendant never was knocked to the floor. There was ample evidence to support the verdict of the jury, and from a study of the record as a whole, it is difficult to imagine a jury, if defendant was retried ever so many times, reaching any conclusion other than was reached here. In fact, the evidence was sufficient to have supported a verdict of murder, rather than manslaughter in the first degree. The testimony forces this conclusion, and by such fact, and by reason of the further fact that even though the jury did not find the defendant guilty of murder but of the lesser included crime of manslaughter in the first degree, still the punishment could have been imprisonment in the penitentiary for any term from four years to life. 21 O.S. 1951 § 715. The term fixed was 36 years.

If it could be determined that the remarks of the county attorney in his closing argument to the jury were inflammatory and did prejudice the jury against the defendant, and probably resulted in the jury finding the accused guilty, the defendant might be entitled to a new trial, or at least to a modification of the punishment assessed.

■ This court, as contended by counsel for the defendant, has often held that it is improper for the prosecuting attorney to state his personal opinion as to the defend-

ant's guilt or state facts not proved by evidence, or otherwise get before the jury that which amounts to his own testimony. Cline v. State, 57 Okl.Cr. 206, 47 P.2d 191; Glasgow v. State, 88 Okl.Cr. 279, 202 P.2d 999. And see also Kimbrough v. State, 64 Okl.Cr. 458, 82 P.2d 245; Fry v. State, 91 Okl.Cr. 326, 218 P.2d 643; Sweet v. State, 68 Okl.Cr. 44, 95 P.2d 242, and Davis v. State, Okl.Cr., 272 P.2d 478.

The State was represented by Mr. J. Howard Edmondson, Assistant County Attorney, and by Mr. Robert Simms, special prosecutor. Counsel for the defendant set out the following excerpts said to be improper, and we quote from their brief:

"'Mr. Simms: * * * Why did Massey run? *Because in my opinion he knew he had killed another man and was wanting to get as far away from there as he possibly could.* * * *

"'* * * He hadn't made any effort whatever to contact the police officers. Why? *Because in my opinion—*

"'Mr. Ward: Now, if your Honor please, I don't want to interrupt Bob's argument, but as I understand the law, counsel may not express their opinion.

"'The Court: Overruled.

"'Mr. Ward: Exception.

"'Mr. Simms:—*because in my opinion, ladies and gentlemen of the jury, this defendant knew that he had killed stabbed, slashed Dennis Potter and left him to die on the floor.*

* * * * * *

"'Mr. Edmondson: * * * I will say this. *I will say that Dennis Potter was murdered by Cecil Massey* and I will say further that if this jury sees fit to give him the death penalty for doing it, that I sincerely feel you are perfectly justified in doing it. Look at the hands of Cecil Massey, smeared with the blood of Dennis Potter! Why should I hesitate to say you were justified, when the rule is that whoever sheddeth man's blood shall also by his own blood be shed.'"

The record discloses that at the close of the argument Mr. Ward, one of the defendant's counsel, said:

"I want to take exception to the last several closing statements of the prosecutor in which he expressed his own personal opinion to the jury, same being contrary to law and prejudicial, particularly with reference to the phraseology in which he referred to his expression regarding the death penalty, making it in the form of a personal opinion, and ask the Court to declare a mistrial."

The court declined to declare a mistrial, to which counsel excepted, but the court did say to the jury:

"Now ladies and gentlemen of the jury, the argument of counsel is not evidence in this case and is not to be considered by you as any evidence in the case at all. The argument of counsel has a legitimate part in the trial of any case under our system of the law, its purpose being to assist the jury. Now, if at any time during the argument of counsel in this case, counsel has expressed a personal opinion, that is something, of course, that you should disregard."

■ The arguments of both counsel for the State and counsel for the defendant is preserved in the record, and we have carefully read them, and while counsel for the State should always make it clear to the jury that the deductions and conclusions he sets out in his argument are based solely on the evidence that the jury has heard, rather than some independent information possessed by the prosecutor, considering the arguments by both counsel for the State and counsel for the defendant, together with the admonition given the jury by the court concerning such arguments, we do not believe the argument of the county attorney was such as to deprive the defendant of a substantial right, or that it did in fact arouse the passion and prejudice of the jury to the extent that such argument swayed the jury in reaching the verdict that it did.

If any of the other numerous persons in the Jackson Bar had observed a knife in the hand of the deceased; if one had been found on the floor or if it had appeared that the deceased was the aggressor, that would lend substance to the argument of counsel that the sentence imposed was probably influenced by the argument of the county attorney, in spite of the instructions of the court, rather than by the evidence, and we would not hesitate in exercising our statutory power of modification. But we can find no justification in the record. Counsel for the defendant argued to the jury that the witnesses for the State, including some of the officers, just plainly lied, but the jury thought otherwise. Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479. See also paragraph four of the syllabus in Sweet v. State, supra.

Further complaint is made of the action of the county attorney in his cross-examination asking the defendant, "Have you ever been convicted of any offense, Mr. Massey, which constitutes a crime under the laws of Oklahoma?"

■■ The defendant on questioning by his counsel had denied ever having been convicted in a district court or a common pleas court. And by cross-examination the defendant finally admitted convictions in the city court of drunkenness, disturbing the peace, and of reckless driving. The county attorney had reason, apparently, to believe that defendant was seeking to hide something, and the questioning was proper as bearing on the credibility the jury might give to the evidence of the defendant. The court properly instructed the jury concerning this. Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927; 12 O.S.1951 § 381.

■ There were other objections to the cross-examination by the county attorney concerning blood shown to have been on garments worn by the defendant during the fatal cutting. We do not deem this cross-examination improper in view of the evidence in the case.

This case presents a tragic situation all too common throughout the land, where high-strung persons saturated with alcohol

by the drinking of beer or other like beverages, become belligerent and combative. Here the deceased was apparently free with language, and the accused by the evidence resorted to the use of his knife with fatal results. Counsel for the State and counsel for the defendant clearly presented to the jury their respective views concerning the evidence.

It is our conclusion that the defendant had a fair trial, and the fact question presented was determined by the jury adversely to the defendant, which was in the province of the jury to decide, and nothing is presented by the record that would justify interference by this court.

The judgment appealed from is affirmed.

JONES, P. J., and BRETT, J., concur.